**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Crescenciano M. PENA,
Defendant–Appellant.**

No. 88–2883.

United States Court of Appeals,
Tenth Circuit.

Dec. 4, 1990.

Richard A. Stacy, U.S. Atty., and David A. Kubichek, Asst. U.S. Atty., Casper, Wyo., for plaintiff-appellee.

Michael G. Katz, Federal Public Defender, and Frances Smylie Brown, Asst. Federal Public Defender, Denver, Colo., for defendant-appellant.

Crescenciano M. Pena, pro se.

Before BALDOCK and EBEL, Circuit Judges, and CONWAY,* District Judge.

CONWAY, District Judge.

After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. *See* Fed.R.Civ.P. 34(a); 10th Cir.R. 34.1.9. Therefore, the case is ordered submitted without oral argument.

Defendant–Appellant Crescenciano M. Pena was convicted by a jury of possession with intent to distribute cocaine, in violation of 21 U.S.C. § 841(a)(1) and § 841(b)(1)(A)(ii). The district court sentenced Pena to the mandatory minimum sentence of imprisonment for not less than twenty years, followed by supervised release of ten years. He now appeals his conviction and sentence, contending that:

1. his detention following the initial stop for speeding was unreasonable, in violation of the Fourth Amendment, and tainted his consent to search;

2. the search of his automobile exceeded the scope of his consent;

3. certain statements made prior to his arrest and before he received the *Miranda* warnings were the result of custodial interrogation and should have been suppressed;

4. the district court erred in failing to dismiss the Indictment for violation of the Speedy Trial Act;

5. the sentence violates the Eighth Amendment prohibition against cruel and unusual punishment; and

6. he was denied effective assistance of counsel, in violation of the Sixth Amendment.

We affirm.

I.

On April 15, 1988, eastbound on I–80 in Uinta County, Wyoming, Highway Patrolman Leonard DeClercq stopped an older model Pontiac Grand Prix with California plates for exceeding the posted sixty-five miles per hour speed limit. DeClercq's radar indicated that the vehicle was traveling seventy-one miles per hour. Before approaching the Pontiac, DeClercq radioed Dispatch for a registration and warrant check through the National Crime Information Center (NCIC) computer. He also noticed that the trunk lock on the vehicle had been punched out, raising some suspicion in his mind as to whether the car was stolen.

As DeClercq approached the Pontiac, the driver, who was the only occupant of the automobile, got out and met the officer. As requested by the patrolman in English, he gave DeClercq a driver's license, which was issued by Illinois and identified him as Crescenciano Pena of Chicago. He was unable, however, to provide the vehicle's registration. Upon questioning Pena told DeClercq that he presently lived in Santa Barbara, California. He informed the officer that the vehicle belonged to his brother and that he was driving to Chicago to visit his sick mother. He also showed DeClercq a receipt for work recently done on the car, explaining that the car was not running correctly, so he could not have been speeding.

DeClercq returned to his patrol car to receive the results of the NCIC request and

---

* The Honorable John E. Conway, United States District Judge for the District of New Mexico, sitting by designation.

to write the speeding citation. The dispatcher informed him that California reported the registered owner of the Pontiac as Yolanda Diaz of Santa Barbara. The NCIC computer was "down," however, delaying results of the inquiry as to whether the vehicle was reported stolen. It was later determined that the vehicle was not so reported.

DeClercq returned to the rear of the Pontiac, his suspicions heightened as to the status of the automobile, to further question Pena about its ownership. Pena repeated that the car was owned by his brother. When asked again as to his destination, Pena told DeClercq that he was on his way to Ohio. DeClercq inquired whether Pena knew Yolanda Diaz. Pena said no. When informed that the car was registered in Diaz's name and asked if he had her permission to drive it, Pena shrugged his shoulders.

DeClercq asked Pena if he knew what was in the trunk of the car, as knowledge of the contents would be some evidence of rightful possession. Pena told him that there was nothing there and asked the patrolman if he wanted to look. DeClercq indicated that he did want to take a look and Pena got a screwdriver from the passenger compartment of the car and opened the trunk. As Pena had indicated, there was not much in the trunk, a spare tire and jack, a blue blanket, a container for antifreeze, and a couple cans of oil. After inspecting the trunk DeClercq told Pena that he could close it. Pena then got in the driver's seat to return the screwdriver.

Patrolman DeClercq walked up to the passenger side of the front seat. Pena reached across to unlock the door and DeClercq opened it and asked to look inside the car. Pena indicated that he did not mind and got out of the vehicle, going to stand at the rear of the auto on the passenger side. DeClercq asked him if he had any narcotics or firearms in the vehicle, to which Pena said no. Noticing that the rear bottom seat cushion was ajar, DeClercq also got Pena's consent to remove a blue suitcase that was lying on it.

Entering the rear seating area, DeClercq looked under the seat and found nothing. He did observe, however, loose, crooked, and missing screws on the interior molding and tool marks on the screws and molding. While DeClercq was in the vehicle, Pena took the blue suitcase to the back of the car, put it up on the trunk lid, and opened it, all without any request by the officer that he do so.

On exiting the car DeClercq tapped the outer rear fender on the passenger side and heard a solid thud. Believing that this area should normally be hollow, the officer probed the vent opening in the rear quarter panel where the passenger door closed with a pen and struck a solid object which moved when he applied pressure to it. While this was occurring, Pena walked approximately fifteen feet away from the car and paid no attention to the officer. The officer got a screwdriver from the patrol car, returned to Pena's vehicle, and removed the rear quarter panel vent and a piece of cardboard under it. Concealed within that opening he saw four or five white boxes.

DeClercq called Pena back to the Pontiac and asked him what was inside the boxes and where they had come from. Pena responded that he didn't know. At that point DeClercq arrested Pena. Shortly afterward, several backup officers arrived at the scene. One officer performed a field test on a sample of the substance from the boxes, getting a positive response for cocaine. As DeClercq attempted to advise Pena of his *Miranda* rights, Pena said, that "some guy" had given him the car to drive. DeClercq advised him not to make any statements and again attempted to advise him of his rights. Pena then said that he didn't speak English very well. A later search of the automobile, pursuant to a warrant, discovered more than nineteen kilograms of cocaine.

## II.

 As a preliminary matter we address Appellant's assertion that he cannot communicate in English. At the suppression hearing Pena denied any understanding of

English. He used the services of an interpreter at all proceedings. In the Pro Se Supplementary Brief to Initial Appeals [*sic*] Brief Filed on May 26th.1989 [*sic*], which was allowed by this panel in its order of April 25, 1990, Pena contends that DeClercq's statement that he answered, "No, not at all," to the patrolman's request to search the vehicle is so suspect that it casts doubt on the validity of all of DeClercq's testimony. This phrase was quoted in the trial court's Order Denying Motion to Suppress Evidence at 4 and the Brief of Appellee at 4.

Pena maintains that the phrase "No, not at all" is an inherently inappropriate response from one without knowledge of English grammar or the ability to speak English fluently. He describes it as being an "upper-class British idiom in keeping only with someone raised in the U.K." and "used only by one fully articulate in the language and having a fluent command of the tongue." *Pro Se* Supplementary Brief at 2.

Appellant's reliance on the phrase "No, not at all," whatever its idiomatic origins, is misguided. A review of the record reveals that Patrolman DeClercq never used that phrase himself. It was posed at the trial in the form of a question by the prosecutor, who asked DeClercq:

Q. And then you asked him if he minded if you could look—if he minded if you looked in the interior of the vehicle?
A. Yes.
Q. How did he respond to that?
A. He responded no, that he didn't mind if I looked inside the vehicle.

\* \* \*

Q. ... So you asked him if you could look in the inside of his vehicle and he says "No, not at all"? [*sic*]
A. Correct.

Record, vol. IV, at 259–60. At the suppression hearing DeClercq responded to the questioning of the prosecutor:

Q. Did you converse with the defendant at that point?
A. Yes I asked him if he minded if I took—I asked him if he would mind if I looked inside the vehicle.

Q. And exactly how did he respond to that?
A. He responded, "No," he didn't mind.
Q. He said, "No, I don't mind"? [*sic*]
A. No. He just said, "No."

Record, vol. II, at 22.

DeClercq testified repeatedly at both the suppression hearing and the trial that Pena spoke understandable, if broken, English and that his responses were contextually appropriate under the circumstances. This testimony was corroborated by other government witnesses. There was also evidence that Pena had lived in the United States for the previous thirty-one years and attended an elementary education course conducted in English while incarcerated in a federal penitentiary.

The district court found that Pena clearly and unequivocally consented to the search of his vehicle. The court did so even though Pena testified at the suppression hearing that he had no understanding of the English language. Assessment of the credibility of witnesses is the prerogative of the trial court, not an appellate court, which neither sees nor hears the witnesses. *United States v. Obregon,* 748 F.2d 1371, 1377 (10th Cir.1984). Thus, viewing the evidence in the light most favorable to the government, *United States v. Lopez,* 777 F.2d 543, 548 (10th Cir.1985), we cannot say the trial court was clearly in error in this finding, *United States v. Cooper,* 733 F.2d 1360, 1364 (10th Cir.), *cert. denied,* 467 U.S. 1255, 104 S.Ct. 3543, 82 L.Ed.2d 847 (1984).

### III.

The first issue on appeal is whether the trial court erred in failing to suppress evidence because Pena's detention following the initial stop for speeding was unreasonable under the Fourth Amendment and tainted his consent to search. In reviewing denial of a motion to suppress we accept the trial court's findings of fact unless they are clearly erroneous. *Id.* Additionally, we must view the evidence on appeal in the light most favorable to the government. *Lopez,* 777 F.2d at 548. The ultimate de-

termination of reasonableness, however, is a conclusion of law that we review *de novo*. *United States v. McKinnell*, 888 F.2d 669, 672 (10th Cir.1989).

■ The Fourth Amendment protects against *unreasonable* searches and seizures. *United States v. Espinosa*, 782 F.2d 888, 890 (10th Cir.1986). In determining the reasonableness of a search and seizure, the court employs a dual inquiry: 1) whether an officer's action was justified at its inception; and 2) whether the action was reasonably related in scope to the circumstances that first justified the interference. *United States v. Guzman*, 864 F.2d 1512, 1518 (10th Cir.1988) (quoting *Terry v. Ohio*, 392 U.S. 1, 19–20, 88 S.Ct. 1868, 1878–79, 20 L.Ed.2d 889 (1968)). This inquiry utilizes an objective analysis of the facts and circumstances. *See id.* at 1517.

Appellant does not contest the legality of the initial stop for speeding or that he consented to a search. He argues, however, that the initially valid stop evolved into an unreasonable detention and that the consent obtained as a result of this illegal seizure is invalid. An initially valid stop can, of course, at some point become unreasonable. *United States v. Rivera*, 867 F.2d 1261, 1263 (10th Cir.1989). We do not find that to be the case here, however.

When conducting a routine traffic stop an officer may ask for a driver's license and vehicle registration, run a computer check, and issue the citation. *Guzman*, 864 F.2d at 1519. If the driver produces a valid license and proof of right to operate the vehicle, the officer must allow him to continue on his way without delay for further questioning. *Id.* The officer must have reasonable suspicion of illegal activity to justify even a temporary detention for questioning. *Id.* Such searches and seizures are upheld when the officer can identify " 'specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.' " *Rivera*, 867 F.2d at 1263 (quoting *Terry*, 392 U.S. at 21, 88 S.Ct. at 1880). Police officers need not close their eyes to suspicious circumstances. *Espinosa*, 782 F.2d at 891.

In this case there is ample evidence to support the trial court's finding that Appellant's detention following the initial stop was reasonable and that Patrolman DeClercq was justified in delaying Pena to investigate his reasonable suspicion that the car was stolen. Although the automobile was in fact not stolen, DeClercq was unaware of its status because the NCIC computers were down, and Pena was unable to provide proof that he was entitled to operate the car. What DeClercq did know was that the vehicle had California plates and a punched out trunk lock and was being driven by an Illinois licensed driver who could not provide the registration. Additionally, Pena gave inconsistent answers concerning his destination, stated twice that the vehicle belonged to his brother, and professed no knowledge whatsoever of Yolanda Diaz, the registered owner. Furthermore, when informed of Diaz's status and asked if he had her permission to use the vehicle, Pena merely shrugged his shoulders. Thus, we hold that detention of Pena following the initial stop was reasonable and that Pena's consent was, therefore, valid.

## IV.

■ Appellant next contends that the trial court erred in denying his motion to suppress because the search undertaken by Patrolman DeClercq exceeded the scope of Pena's consent. Pena argues that his consent went only to allowing the officer to "look" inside the car. He claims that the officer's actions beyond merely looking around inside the vehicle, particularly the removal of the vent panel, exceeded the scope of his consent.

It is clear that the scope of a consent search is limited by the breadth of the consent given. *United States v. Gay*, 774 F.2d 368, 377 (10th Cir.1985). Whether a search remains within the boundaries of the consent is a question of fact to be determined from the totality of the circumstances, and a trial court's findings will be upheld unless they are clearly erroneous. *Espinosa*, 782 F.2d at 892. We must view

the evidence in the light most favorable to the government. *Lopez*, 777 F.2d at 548.

■ Pena does not contest that he voluntarily consented to DeClercq's search of the trunk, unlatching it himself with the screwdriver. He also unlocked the passenger door of the vehicle and consented when DeClercq requested permission to look inside. During DeClercq's initial investigation of the rear passenger area, Pena, without being requested to do so, opened his suitcase on the rear trunk lid, presumably for the patrolman's inspection. He did not object when the officer looked under the rear seat. While DeClercq focused his attention on the rear quarter panel, Pena, apparently unconcerned, walked some distance from the vehicle. At no time did he object to or express any concern about the officer's activities. He never attempted to limit or retract his consent.

As the *Espinosa* court recognized, "[f]ailure to object to the continuation of the search under these circumstances may be considered an indication that the search was within the scope of the consent," 782 F.2d at 892. We will not attach an unduly restrictive meaning to the officer's request to "look" inside the vehicle. No evidence was presented by Pena that he at any time objected to the search as it was conducted. The search was conducted within the general scope of the permission granted. Accordingly, we do not find clearly erroneous the trial court's determination that the search was valid.

## V.

Pena also challenges denial of his motion to suppress on grounds that statements made prior to his arrest and prior to the administering of the *Miranda* warnings were the result of custodial interrogation and should have been suppressed. When reviewing denial of a motion to suppress we must accept the trial court's findings of fact unless they are clearly erroneous. *United States v. Ellison*, 791 F.2d 821, 822 (10th Cir.1986). Additionally, we must view the evidence on appeal in the light most favorable to the government. *Id.*

■ At trial, Patrolman DeClercq testified to certain statements made by Appellant when he called him back to the car after finding the boxes in the rear quarter panel. DeClercq stated that he "asked him [Pena] to step back up to the vehicle and to look inside the little hole where the vent plate cover was." Record, vol. IV, at 275. After Appellant approached the vehicle and looked where directed, DeClercq asked him, "What are these packages?" *Id.* Appellant stated he didn't know. When asked how they had gotten there, Appellant again said he didn't know. At that point DeClercq arrested him.

Pena contends that the district court erred in allowing these statements to be admitted at trial because they were clearly the result of custodial interrogation and were made prior to the giving and waiving of *Miranda* rights. It is undisputed that Pena made these statements before he received the *Miranda* warnings. What is contested is whether Pena was in custody at the time he answered DeClercq's questions.

An arrest or seizure can occur even if the citizen is not formally placed under arrest. *United States v. Maez*, 872 F.2d 1444, 1450 (10th Cir.1989). An individual temporarily detained in a routine traffic stop, however, is "not 'in custody' for the purposes of *Miranda*," even though the stop significantly limits his freedom of action. *Berkemer v. McCarty*, 468 U.S. 420, 436, 440, 104 S.Ct. 3138, 3148, 3150, 82 L.Ed.2d 317 (1984). *Miranda* does apply, though, if the detainee is "subjected to treatment that renders him 'in custody' for practical purposes." *Id.* at 440, 104 S.Ct. at 3150.

The critical determination is whether an officer has restrained the liberty of a person by means of physical force or show of authority so that a reasonable person would not believe he was free to leave. *Maez*, 872 F.2d at 1450 (citing *Terry*, 392 U.S. at 19 n. 16, 88 S.Ct. at 1879 n. 16; *Florida v. Royer*, 460 U.S. 491, 502, 103 S.Ct. 1319, 1326, 75 L.Ed.2d 229 (1983) (plurality opinion) (quoting *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980) (Stewart,

J., joined by Rehnquist, J.))). Circumstances that might indicate a seizure include the threatening presence of several officers, the display of a weapon by an officer, physical contact with the subject, and an officer's use of language or tone of voice in a manner implying that compliance with the request might be compelled. *Mendenhall*, 446 U.S. at 554, 100 S.Ct. at 1877; *Maez*, 872 F.2d at 1450. An officer's unarticulated plan to arrest an individual, however, is not relevant to the determination of "whether a suspect was 'in custody' at a particular time; the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." *Berkemer*, 468 U.S. at 442, 104 S.Ct. at 3151.

Appellant contends that he was in custody because DeClercq "called" him back to the car, rather than asking him if he would mind returning, and because DeClercq decided to arrest him as soon as he discovered the boxes. Pena also surmises that DeClercq "more than likely" used a tone of voice indicating an element of compulsion. Finally, he claims that DeClercq had physical control of his automobile.

We do not find Pena's position compelling. As is clear above, the patrolman's subjective decision to arrest Appellant is not relevant to our inquiry, absent evidence that he communicated this intent to Pena prior to asking him the questions. Pena offers us no such evidence. Indeed, he offers us no circumstances similar to those enunciated in *Mendenhall*. Conjecture as to tone of voice and as to the significance we should assign to the fact that the officer "called" him to the car is insufficient, as is the fact that DeClercq did arrest him. Accordingly, we find that the district court's admission of these statements is not clearly erroneous.

## VI.

■ Pena next contends that the trial court erred in denying his motion to dismiss for violation of the Speedy Trial Act, 18 U.S.C. §§ 3161–3174. Section 3161(c)(1) provides in relevant part:

In any case in which a plea of not guilty is entered, the trial of a defendant charged in an ... indictment with the commission of an offense shall commence within seventy days from the filing date (and making public) of the ... indictment, or from the date the defendant has appeared before a judicial officer of the court in which such charge is pending, whichever date last occurs.

Pursuant to 18 U.S.C. § 3162(a)(2), "[i]f a defendant is not brought to trial within the time limit required by section 3161(c) as extended by section 3161(h), the ... indictment shall be dismissed on motion of the defendant." Section 3161(h) provides:

The following periods of delay shall be excluded ... in computing the time within which the trial of any such offense must commence:

(1) Any period of delay resulting from other proceedings concerning the defendant, including but not limited to—

\* \* \*

(F) delay resulting from any pretrial motion, from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion;

\* \* \*

(J) delay reasonably attributable to any period, not to exceed thirty days, during which any proceeding concerning the defendant is actually under advisement by the court.

Pena was arrested on April 15, 1988, and indicted on May 20, 1988. His trial began on September 7, 1988, the 110th day following his indictment. Pena contends that only two excludable events occurred during this period: (1) his motion to dismiss the Indictment, filed on June 30, 1988, and heard on July 15, 1988, excluding fifteen days; and (2) his motion to dismiss on speedy trial grounds, filed on August 10, 1988, and heard on August 19, 1988, excluding nine days. He thus claims only twenty-four excludable days, leaving a total of eighty-six days between indictment and trial, in violation of the seventy-day time limit mandated by the Speedy Trial Act.

The government contends that there were eight excludable events comprising seventy-two excludable days, resulting in a total of only thirty-eight days counting toward the seventy-day maximum. Rather than address each of these events, it is sufficient to analyze further only the motions upon which Appellant relies. First, the correct computation of excludable days attributable to Appellant's two motions is sixteen and ten respectively. Furthermore, Pena errs in relying solely on § 3161(h)(1)(F).

Section 3161(h)(1)(J) clearly provides for exclusion of up to thirty days for delay reasonably attributable to the trial court taking under advisement a proceeding concerning the defendant. While Pena's motion for dismissal pursuant to the Speedy Trial Act was heard on August 19, 1988, the court took it under advisement and ultimately denied it prior to commencement of the trial on September 7, 1988. This results in an additional nineteen excludable days from August 20, 1988, to September 7, 1988. The total excludable days for both motions is forty-five, leaving sixty-five days within which trial was commenced. Thus, the seventy-day mandate of the Speedy Trial Act clearly was met.

### VII.

■ Appellant contends that his sentence constitutes cruel and unusual punishment in violation of the Eighth Amendment. Section 841(b)(1)(A) of 21 U.S.C. sets forth the penalty for possession with intent to distribute five or more kilograms of cocaine. It provides in pertinent part:

> If any person commits such a violation after a prior conviction for a felony drug offense has become final, such person shall be sentenced to a term of imprisonment which may not be less than twenty years and not more than life imprisonment. . . .

Pena was convicted in 1983 of conspiracy to possess heroin with intent to distribute, in violation of 21 U.S.C. §§ 846 and 841(a)(1), a prior conviction for a felony drug offense. Thus, pursuant to 21 U.S.C. § 841(b)(1)(A), the court sentenced him to the minimum mandatory sentence of imprisonment for not less than twenty years.

The Eighth Amendment prohibits barbaric punishment and sentences disproportionate to the crime committed. *Solem v. Helm,* 463 U.S. 277, 284, 103 S.Ct. 3001, 3006, 77 L.Ed.2d 637 (1983); *United States v. Gourley,* 835 F.2d 249, 252 (10th Cir. 1987), *cert. denied,* 486 U.S. 1010, 108 S.Ct. 1741, 100 L.Ed.2d 204 (1988). Within the strictures of the Eighth Amendment, however, determination of proper criminal penalties is a matter for legislative bodies. *Gourley,* 835 F.2d at 252–53. Thus, a sentence within the prescribed statutory limits generally will not be found to be cruel and unusual. *Id.* at 253.

An analysis of the proportionality of a sentence should be guided by objective criteria, including comparison of the sentence imposed with (1) the gravity of the offense; (2) sentences imposed on other criminals in the same jurisdiction; and (3) sentences imposed on others convicted of the same crime in other jurisdictions. *Solem,* 463 U.S. at 290–92, 103 S.Ct. at 3009–11. While it is true that no sentence is *per se* constitutional, proportionality challenges of particular sentences, excepting those involving capital punishment, have rarely been successful. *United States v. Berryhill,* 880 F.2d 275, 277 (10th Cir.1989) (citing *Solem,* 463 U.S. at 290, 103 S.Ct. at 3009; *Rummel v. Estelle,* 445 U.S. 263, 268, 100 S.Ct. 1133, 1136, 63 L.Ed.2d 382 (1980)), *cert. denied,* 110 S.Ct. 853 (1990).

Pena does not contend that the sentence he received is barbaric. Neither does he challenge the sentence as to the third prong of the proportionality test. He acknowledges that the mandatory minimum sentence makes this element irrelevant as all criminals falling within the criteria of the statute will receive the same minimum sentence.

Pena attacks his sentence as to the first two prongs of the proportionality test. He first contends that his sentence is extremely harsh when compared to his actual culpability. Although Pena admits that the transportation of more than nineteen kilograms of cocaine is a grave offense, he

argues that he was a "mere courier," as opposed to a "high rolling drug dealer." In support of this assertion he points to the fact that his fingerprints were not found on any of the secreted boxes of cocaine, purportedly showing that he never had actual physical custody of the drugs and probably was unaware of the amount involved. He also points to evidence indicating that prior to his arrest he and his family lived in poverty on welfare.

Congress has determined that drug trafficking is a most serious problem confronting our society, necessitating harsh penalties. This case involved one of the largest drug seizures ever in Wyoming, with the cocaine being valued at up to $7,600,000. The court sentenced Pena to the *minimum* mandatory term of imprisonment he could receive. An identical sentence is mandated for crimes involving only five kilograms of cocaine. As we commented in *United States v. Arredondo–Santos:*

> When a crime is committed by two or more persons, one will almost always have a different level of participation. One may have conceived the plan; another may have financed the crime; another may have provided automobiles or tools; and yet another may be the distributor. *To argue that one of these participants is more or less culpable than another is not productive. The services or contributions of each may be indispensable to the completion of the crime.*

911 F.2d 424, 426 (10th Cir.1990) (emphasis added). While Pena's sentence may be harsh, we do not find it in any sense disproportionate to the gravity of the crime he committed and his degree of culpability.

Pena's contention that his sentence is grossly disproportional when compared to sentences imposed for other crimes is also without merit. Specifically, he compares his sentence to that which would be received by a defendant convicted of armed bank robbery, a crime which he describes as more violent than the crime he committed.

While it may be that conviction for armed bank robbery, even when involving serious bodily injury to a teller, results in a lesser sentence than that received by Pena, we do not find his sentence to be unconstitutionally disproportionate. This was his second conviction of a serious drug offense, a crime for which Congress has determined mandatory minimum sentences are necessary for the protection of society and as a deterrence. *See United States v. Savinovich,* 845 F.2d 834, 840 & n. 3 (9th Cir.), *cert. denied,* 488 U.S. 943, 109 S.Ct. 369, 102 L.Ed.2d 358 (1988). Other serious federal crimes can result in stronger penalties than that received by Appellant, even if the victim sustains no serious bodily injury. *See United States v. Holmes,* 838 F.2d 1175, 1178–79 (11th Cir.) (Kidnapping, 18 U.S.C. § 1201(a); piracy under the law of nations, 18 U.S.C. § 1651; and hostage taking, 18 U.S.C. § 1203, provide punishment up to life imprisonment.), *cert. denied,* 486 U.S. 1058, 108 S.Ct. 2829, 100 L.Ed.2d 930 (1988). Appellant's sentence is not disproportionate to sentences imposed for other serious crimes.

### VIII.

Appellant's final contention on appeal, first raised in his *Pro Se* Supplementary Brief, is that he was denied effective assistance of counsel, in violation of the Sixth Amendment. He asserts that his representation was constitutionally defective in three respects: (1) failure to adequately cross-examine Patrolman DeClercq concerning the circumstances of the giving of consent to search the vehicle; (2) failure to adequately investigate or cross-examine the patrolman concerning his testimony regarding the "thumping" of the rear quarter panel of the vehicle and the inferences to be drawn from that act; and (3) failure to cross-examine DeClercq as to Pena's version of the stop—that DeClercq threw him to the ground, handcuffed him, and placed him in the patrol car prior to searching the door panels of Pena's vehicle.

To establish ineffective assistance of counsel sufficient to warrant reversal of a conviction, the defendant must show that counsel's performance was deficient and that this deficient performance prejudiced the defense. *Laycock v. New Mexico,* 880

F.2d 1184, 1187 (10th Cir.1989) (citing *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984)). Our review is *de novo. Id.*

The standard for attorney performance is that of reasonably effective assistance. *Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064. Thus, the first prong under *Strickland,* deficient performance of counsel, is proved by showing that counsel's advice was not objectively reasonable considering all the circumstances. *Id.* at 688, 104 S.Ct. at 2064. Such a showing must overcome the strong presumption that "counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689, 104 S.Ct. at 2065.

The second prong of the *Strickland* test requires the defendant to affirmatively prove prejudice. *Id.* at 693, 104 S.Ct. at 2067. The defendant must show that

there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

*Id.* at 694, 104 S.Ct. at 2068.

Pena first argues that his counsel was ineffective because he failed to adequately cross-examine Patrolman DeClercq with regard to Pena's vocalization of consent to search the vehicle. Specifically, Pena points to DeClercq's alleged testimony that Pena replied, "No, not at all," in giving permission to search the interior of the automobile. Pena asserts that his counsel should have established on cross-examination that this testimony was mistaken or perjurious.

As we have already determined in Part II of this opinion, Appellant's reliance on this phrase is misguided. DeClercq did not use these words in his testimony. Therefore, it cannot be error for Pena's attorney to have failed to cross-examine the witness as to this phrase. Furthermore, to the extent Pena's argument here rests on his purported inability to speak English sufficiently to give consent to search, his counsel clearly made this an issue before the trial court. We find no evidence that his representation

in this matter was objectively unreasonable.

▋ Appellant's second basis for ineffective assistance of counsel is also without merit. Pena contends that his counsel failed to effectively cross-examine Patrolman DeClercq as to his "thumping" of the body of the vehicle. DeClercq stated that when he tapped on the outer rear quarter panel he heard a solid thumping sound, rather than the hollow sound he would have expected. Pena argues that if his counsel had investigated he would have discovered the

well-known scientific fact that placing solid objects in a hollow space does not create any different resonance than if the same objects were not there at all. Only if the objects are placed flush with and encompassing the surface of the sides of the hollow (space) can one obtain a 'dull' response.

*Pro Se* Supplementary Brief at 13. Cross-examination in this regard presumably would have impeached the officer's testimony.

We cannot find this issue as other than Pena himself describes it—"wholly academic." *Id.* Common sense and experience tell us that when a hollow area such as a wheel well is filled with something, tapping on the outside will result in a different sound than if it were empty. Thus, we do not find Pena's counsel's performance unreasonable in failing to press the officer on his description of the unexpected sound.

Additionally, at the time he tapped the rear quarter panel, DeClercq was searching the vehicle pursuant to Appellant's consent. Therefore, we can in no way find that but for this alleged error by counsel, there is a reasonable probability that the results of the proceedings, whether the suppression hearing or the trial, would have been different. Insufficient prejudice alone is sufficient to counter Appellant's claim of ineffective counsel, regardless of the issue of deficient performance. *See Strickland,* 466 U.S. at 697, 104 S.Ct. at 2069.

Finally, Appellant contends that counsel's failure to question Patrolman De-Clercq as to Pena's version of the events constitutes defective assistance sufficient to require reversal. Specifically, Pena claims to have informed counsel that De-Clercq threw him to the ground, handcuffed him, and placed him in the patrol car prior to searching the door panels of the vehicle. Pena argues that this information should have been used by his counsel on cross-examination to impeach the officer's testimony.

We find no reason to believe that cross-examination of Patrolman DeClercq in this regard necessarily would have cast doubt on the truthfulness of his testimony. It is clear, however, that Appellant's credibility was at issue. At the suppression hearing Pena first testified that his previous imprisonment was for being in debt, only admitting when challenged that he was convicted of conspiracy to possess heroin with intent to distribute. Additionally, the district court clearly did not believe that Pena was unable to speak English, as he alleged at the suppression hearing. Furthermore, at trial there was evidence showing that Pena told contradictory stories as to the purpose for his trip and his final destination.

Under these circumstances, we cannot say that counsel's decision not to question DeClercq as requested by Pena was beyond the range of reasonable professional assistance. Also, Pena has failed to meet his burden of showing that the outcome would have been different but for this alleged error.

Accordingly, Appellant's conviction and sentence are AFFIRMED.