**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAR 4 2003**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

　　　　Plaintiff - Appellee,

v.

DANIEL LEE LARSON, also known as
Daniel Lee Larson, Jr.,

　　　　Defendant - Appellant.

Nos. 02-4013
(D.C. No. 2:00-CR-41-01-K)
(D. Utah)

UNITED STATES OF AMERICA,

　　　　Plaintiff - Appellee /
　　　　Cross-Appellant,

v.

PAULINE K. BLAKE, also known as
Patricia A. Christensen,

　　　　Defendant - Appellant /
　　　　Cross-Appellee.

Nos. 02-4016 & 02-4034
(D.C. No. 2:00-CR-41-02-K)
(D. Utah)

**ORDER AND JUDGMENT**[*]

---

[*]This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

Before **SEYMOUR**, Circuit Judge, **BRORBY**, Senior Circuit Judge, and **BRISCOE**, Circuit Judge.

---

Defendants Daniel Larson and Pauline Blake, convicted of several drug-related crimes and sentenced to lengthy terms of imprisonment, appeal from the district court's final judgment, asserting the district court erred in denying their motions to suppress evidence. The United States has filed a cross-appeal challenging the district court's decision to depart downward from the guideline range in sentencing defendant Blake. We exercise jurisdiction pursuant to 28 U.S.C. § 1291, affirm the district court's denial of defendants' motions to suppress, and reverse defendant Blake's sentence and remand to the district court for resentencing.

I.

On December 13, 1999, Detective Shaun Bufton, a deputy with the Utah County Sheriff's Office assigned to the Utah County Major Crimes Task Force, received a phone call from a confidential informant indicating that a methamphetamine laboratory was being stored in Unit 395 of the Beehive Storage Units in Draper, Utah. The informant mentioned the names of defendants Larson and Blake (identified as "Patty Christensen"), and Thomas K. Jones. The following day, Bufton and another task force member, Detective Gary Powell of the Provo City Police Department, went to the Beehive Storage Units to investigate. After a positive canine "alert" on Unit 395, Powell used a laptop computer to draft an affidavit in support of a search warrant. Powell telephoned a state

court judge and read the contents of the affidavit to the judge, who verbally authorized Powell to sign a search warrant on the judge's behalf. The warrant stated in pertinent part:

> [Y]our affiant expects to locate items associated with the production of methamphetamine to include, glassware, chemicals associated with the production of methamphetamine, buy-owe sheets, cash, packaging material, scales, items used for the ingestion of the above-mentioned controlled substances and other items associated with the production/cooking of methamphetamine, other controlled substances, paraphernalia, buy-owe sheets, pipes, correspondence, and other items indicative of methamphetamine use/distribution.

ROA, Vol. IX, Exh. 2, at 2.

Powell and Burton executed the search warrant for Unit 395. Upon entering the storage unit, the officers encountered "a very strong and over powering chemical odor" that they "associated with a methamphetamine lab." Id., Vol. II at 14. Based upon the odor, the officers concluded "there was some type of chemicals being stored in the storage unit." Id. Inside the unit, the officers found a Ford van, a seat from the van, and a box containing some wires. The officers saw condenser columns and glass items often associated with clandestine methamphetamine labs inside the van. They contacted their supervisor and asked permission to move the van to a secure facility where they could disassemble what they believed to be a meth lab inside the van. The officers cited the extremely cold and windy weather, the confined area of the storage unit, and the fact that processing the suspected lab would significantly impact the business of the storage units (i.e., preventing the storage unit owner or renters from accessing their units). They

received permission to move the van. The van was loaded onto a flat-bed truck and moved to the Utah County Sheriff's Office, where it was placed in a fenced-off impound yard and processed by the officers.

On January 2, 2000, Detective Bufton received another call from the informant. The informant told Bufton that Jones, who had an outstanding board of pardons felony warrant, and who allegedly was "a big player in the drug world," was at a particular building in the area of 700 South 500 West in Salt Lake City and was operating a methamphetamine lab at the location. Id. at 67. Later that same day, another confidential informant called Detective David Knowles, also a task force member, and gave him similar information regarding Jones' whereabouts. After conferring and comparing information, Bufton, Knowles, and Powell located the building described. The officers contacted the Salt Lake City Police Department and asked for the assistance of uniformed officers in conducting a "knock and talk" at the building.

After the uniformed officers arrived, Knowles and Powell knocked on the front door of the building. A woman inside the building asked "who [they] were." Id. at 19. Knowles asked, "[I]s TK [Thomas Jones] here?" Id. at 98. The woman, responding from inside, said, "[T]here's no one here by that name." Id. Knowles stated, "[W]e're police officers" and "we need to talk to you for a minute." Id. The woman responded: "[H]ow do I know you're police officers?" Id. There was a spot on the painted window of the door where the paint had chipped and Knowles "put [his] necklace badge out." Id. At the

-4-

same time, one of the uniformed officers stepped forward and told the woman she could contact dispatch to confirm they were police officers. The woman opened the door and the officers smelled an "overwhelming odor" normally associated with a methamphetamine lab, coming from inside. Id. at 99. In addition, the officers heard "a lot of movement inside, shuffling, . . . people moving around, people talking, male voices," and "saw people looking out . . . the front window." Id. at 98. After observing the officers, the woman closed the door. Knowles continued to ask if "TK" was there and if they could talk to him, but the woman insisted he was not there. She proposed that everyone in the building could come outside so that the officers could "see that TK [wasn't] there." Id.

Three people came out of the building: the woman, who was identified as defendant Blake, defendant Larson, and Cory Matthews. Blake was carrying a large butane torch and "some ph strips" (both of which are commonly associated with methamphetamine production). Id. at 100. Bufton spoke to defendant Larson and Knowles spoke to defendant Blake. Larson informed Bufton that he lived in the building and that Jones had been there earlier. Bufton asked if he could go inside the building to make sure Jones was not in the shop area in the back of the building, and Larson said, "[Y]es, you can go in." Id. At that same approximate time, defendant Blake, who was also identified as living in the building, gave Knowles permission to go inside and "look[,] but just for TK." Id. at 100.

Blake unlocked the front door and entered the building ahead of Knowles, Bufton, and two uniformed officers.  As Knowles entered the building, he again smelled an "overpowering" odor normally associated with a methamphetamine lab.  Id. at 101.  Both Knowles and Bufton observed various items commonly associated with methamphetamine production and use, including torches, glass pipe, and a Pyrex dish containing a white substance that appeared to be methamphetamine.  At that point, Knowles told Blake he was "freezing the environment," indicating he believed there was illegal activity inside the building and that he had probable cause to obtain a search warrant.  Id. at 101.  Because the officers had not swept the entire building, Knowles went to the back of the building where he encountered a locked door that led to a shop area.  Knowles asked Blake if the keys she was holding would open the locked door and Blake held up the keys and said, "[Y]es."  Id.  Knowles took the keys, opened the door, and entered the shop.  According to Knowles, the instant he opened the door to the shop, he smelled an overpowering odor normally associated with a methamphetamine lab and observed a haze inside the area.  Knowles also saw various items inside the shop that he associated with a methamphetamine lab, including a "death bag" (used to vent fumes resulting from the reaction of ephedrine reduction) in the rafters and various chemicals.  Bufton, who entered the shop area after Knowles, also observed tubing, chemicals, bottles, and assorted lab equipment typically associated with a methamphetamine lab.  Based upon their observations, the officers cleared the building, placed the occupants

under arrest, and obtained a search warrant for the building.

Defendants Blake and Larson were indicted by a federal grand jury. They were each charged with possession of methamphetamine with intent to distribute in violation of 21 U.S.C. § 841(a)(1); conspiracy to manufacture methamphetamine in violation of 21 U.S.C. § 846; establishing a place for the purpose of manufacturing, distributing, and using methamphetamine in violation of 21 U.S.C. § 856(a)(1); possession of pseudoephedrine in violation of 21 U.S.C. § 841(d)(2); possession of iodine in violation of 21 U.S.C. § 841(d)(2); and attempting to manufacture methamphetamine in violation of 21 U.S.C. § 846. In addition, Larson was charged with possession of a firearm in furtherance of a drug trafficking offense in violation of 18 U.S.C. § 924(c)(1)(A). Blake and Larson moved to suppress evidence seized during the December 1999 search of the storage unit and the January 2000 search of the building. After conducting an evidentiary hearing, the district court denied defendants' motions. Blake and Larson were convicted on all counts charged in the indictment, Blake was sentenced to a term of imprisonment of 210 months, and Larson was sentenced to a term of imprisonment of 384 months.

II.

In their respective appeals, defendants challenge the district court's denial of their motions to suppress. "On appeal from the denial of a motion to suppress, we view the evidence in the light most favorable to the government and accept the district court's findings of fact unless clearly erroneous." United States v. Neff, 300 F.3d 1217, 1219

(10th Cir. 2002).  The ultimate determination of reasonableness under the Fourth

Amendment is a question of law we review de novo.  Id. at 1220.

*Search of storage unit*

Larson and Blake contend the law enforcement officers involved in the search of

the storage unit failed to record the telephonic application for the search warrant as

required by Utah law.[1]  The district court rejected defendants' arguments, concluding

failure to record the telephone application was the result of a "technical problem" and, in

any event, there was no violation of defendants' constitutional rights.  ROA, Vol. I, Doc.

135 at 4.  Utah law allows a law enforcement officer to obtain a search warrant by

telephonically contacting a state magistrate.  Utah Code Ann. § 77-23-204(2).  When

doing so, the officer is required to provide the magistrate with "sworn oral testimony"

describing the evidence upon which the officer is proceeding.  Id.  The officer's sworn

testimony must "be recorded and transcribed," and the transcribed testimony is "deemed

to be an affidavit."  Id.

Here, it was uncontroverted that Detective Powell obtained a search warrant for

the storage unit by telephonically contacting a state court judge and reading to the judge

---

[1]  In its response, the government asserts that Blake lacks standing to challenge the search of the unit.  The district court reached no conclusion on this issue, and Blake has not filed a reply brief.  While the government may be correct, we are persuaded that Blake nevertheless has standing to challenge the seizure and search of the van since she was its registered owner.  See United States v. Edwards, 242 F.3d 928, 937 (10th Cir. 2001) (holding defendant had standing to object to search of personal luggage contained within trunk of rental car).

an affidavit he had drafted on his laptop computer at the storage unit site (and, in addition, orally describing to the judge the proposed search warrant he had drafted on his laptop computer). At the evidentiary hearing on the defendants' motions to suppress, Powell testified that he was aware of the statutory requirement that his conversation with the judge be taped and transcribed, and that he attempted to comply with the requirement. In particular, Powell testified he believed the Utah County dispatch center (which apparently connected him to the judge) was taping the conversation. Powell and another officer testified that they could not find the tape recording. Powell attributed the problem to the fact that the dispatch center had moved to a new facility prior to his conversation and "the lines weren't marked." ROA, Vol. II at 58.

In United States v. Le, 173 F.3d 1258, 1264 (10th Cir. 1999), we rejected the assertion "that state law standards, rather than federal constitutional standards, . . . govern the admissibility of evidence seized pursuant to [a] state warrant." In doing so, we emphasized "that 'in federal prosecutions the test of reasonableness in relation to the Fourth Amendment protected rights must be determined by Federal law even though the police actions are those of state police officers.'" Id. (quoting United States v. Miller, 452 F.2d 731, 733 (10th Cir. 1971)). "The basis for this principle is that 'the exclusionary rule is only concerned with deterring [federal] Constitutional violations.'" Id. at 1265 (quoting United States v. Wright, 16 F.3d 1429, 1437 (6th Cir. 1994)). "Therefore '[t]he fact that the arrest, search, or seizure may have violated state law is irrelevant as long as

the standards developed under the Federal Constitution were not offended.'" Id. Le disposes of defendants' arguments. The fact that Powell and the state court judge may have violated Utah law by failing to record their conversation does not render the warrant improper under federal constitutional standards, and defendants do not assert otherwise.

Defendants also suggest in passing that the search warrant violated Federal Rule of Criminal Procedure 41(c)(2) which, similar to Utah law, requires a federal magistrate issuing a telephonic search warrant to record and transcribe his or her conversation with the officer seeking the warrant. The initial problem with this argument is that Rule 41(c)(2) is inapplicable since the search warrant was requested by a state law enforcement officer and issued by a state court judge. See Fed. R. Crim. P. 41(a) (noting rule applies where warrant is sought by federal law enforcement officer and granted by federal magistrate judge). In any event, Rule 41(c)(2) provides no relief to defendants. The rule in this circuit is that technical violations of Rule 41(c)(2) require suppression of evidence only if (a) there has been a clear constitutional violation, (b) there was "prejudice" in the sense that the search might not have occurred or would not have been so abrasive if the technical requirements of Rule 41(c)(2) had been followed, or (c) there is evidence of intentional and deliberate disregard of a provision in the rule. See United States v. Rome, 809 F.2d 665, 669 (10th Cir. 1987); see also United States v. Chaar, 137 F.3d 359, 362 (6th Cir. 1998). We are unable to discern any constitutional violation under the facts presented here. Indeed, we conclude that the information set forth in Powell's affidavit

was sufficient to provide probable cause for the issuance of a search warrant. Further, there was no "prejudice" in the sense that the search might not have occurred or would have been different in scope had the conversation between the officer and the state court judge been recorded. Finally, there was no evidence of intentional and deliberate disregard of the technical recording requirements.

*Seizure of van*

In rejecting Larson's motion to suppress, the district court concluded that the "search warrant covered all items inside the storage unit, including the van and therefore, the evidence found inside the van was legitimately seized." ROA, Vol. I, Doc. 135 at 4. Larson asserts seizure of the van from Unit 395 was improper because neither the affidavit nor the search warrant mentioned the van or its owner (the van was actually registered in the name of Pauline Christensen, an alias used by defendant Blake). According to Larson, "[t]he fact that the van was registered to someone other than the person who rented the storage shed [Larson] should have led the police to seek a second warrant" for the van. Larson's Br. at 31-32.

"The scope of a warrant is a question of law which we review de novo." United States v. Ortega-Jiminez, 232 F.3d 1325, 1328 (10th Cir. 2000). "When interpreting warrants, this court has adopted a standard of practical accuracy rather than technical precision." Id. (internal quotations omitted).

The search warrant at issue here stated in pertinent part:

NOW, THEREFORE, YOU AND EACH OF YOU, are hereby directed to conduct a search of the storage shed #395 at Beehive Storage Units located [in] . . . . Draper, Utah. . . .

That your affiant expects to locate items associated with the production of methamphetamine to include, glassware, chemicals associated with the production of methamphetamine, buy-owe sheets, cash, packaging material, scales, items used for the ingestion of the above mentioned controlled substances and other items associated with the production/cooking of methamphetamine, other controlled substances, paraphernalia, buy-owe sheets, pipes, correspondence, and other items indicative of methamphetamine use/distribution.

IF YOU FIND THE DESCRIBED PROPERTY, you are directed to bring the property forthwith before me at the above Court or to hold the same in your possession pending further order of this court.

ROA, Vol. IX, Exh. 2 at 2.

We agree with the district court that the van parked inside the unit was clearly within the scope of the search warrant. The scope of a "premises" search warrant "include[s] those automobiles either actually owned or under the control and dominion of the premises owner or, alternatively, those vehicles which appear, based on objectively reasonable indicia present at the time of the search, to be so controlled." United States v. Gottschalk, 915 F.2d 1459, 1461 (10th Cir. 1990). Although the van was not actually owned by Larson, it was clearly under his control and dominion since it was located inside the locked storage unit that he rented and controlled. Moreover, the officers observed, in plain view through the windshield of the van, the various types of items specifically listed in the search warrant and typically associated with a methamphetamine lab. That fact, combined with the strong odor of methamphetamine, gave the officers a reasonable basis for concluding that a methamphetamine lab, or at least the makings of

-12-

one, was located inside the van. Thus, the seizure and search of the van did not violate Larson's Fourth Amendment rights.

*Search of building*

Larson and Blake assert numerous challenges to the district court's refusal to suppress evidence seized during the January 2000 search of the building in Salt Lake City. Larson asserts that (1) the front porch of the building was part of its curtilage and the officers were restricted from invading it without a warrant, (2) the officers "violated the sanctity of the home" and effectively seized the building "by remaining on the porch and continuing to knock and harass . . . Blake after she told them once that the person they wanted [i.e., Jones] was not there," Larson's Br. at 21, (3) the consent to enter the building was involuntary and the product of coercion, and (4) the officers took the keys to the locked shop area without Blake's consent. Blake asserts that (1) the search was unlawful because it was made without a warrant and under a false pretext manufactured by the officers (i.e., they were looking for Jones), (2) any consent she may have given for the officers to enter the building was involuntary and the result of coercive police tactics, and (3) any consent she may have given did not extend to the locked shop area and the officers took the keys to the locked shop area without her consent.

*Front porch - curtilage*

Larson's curtilage argument (i.e., the officers were required to have a warrant to

-13-

stand on the front porch of the building) hinges on the fact that the property was surrounded by a tall chain-link fence, and the window on the front door had been painted.[2] Larson asserts these factors created an expectation of privacy that the government was required to respect.

The "touchstone" of Fourth Amendment analysis is whether an individual has a reasonable expectation of privacy in the area searched or intruded upon by law enforcement officers. Oliver v. United States, 466 U.S. 170, 177 (1984). The curtilage of a home, which has been defined as "the area to which extends the intimate activity associated with the 'sanctity of a man's home and the privacies of life,'" id. at 180 (quoting Boyd v. United States, 116 U.S. 616, 630 (1886)), is typically "afforded the most stringent Fourth Amendment protection." United States v. Martinez-Fuerte, 428 U.S. 543, 561 (1976). The question here is whether the front porch of the building reasonably falls within the definition of "curtilage."

Contrary to Larson's assertions, we conclude the front porch did not constitute part of the building's curtilage. More specifically, neither the presence of the chain-link fence, through which the officers could see, nor the fact that the front door window had been painted was sufficient to create any reasonable expectation of privacy with regard to the front porch area. E.g., United States v. Santana, 427 U.S. 38, 42 (1976) (concluding

---

  [2] Larson asserted this argument in district court, but the court did not specifically address it in denying Larson's motion to suppress.

-14-

defendant who was standing in doorway of her house was in a "public place" for purposes of Fourth Amendment); United States v. Ventling, 678 F.2d 63, 66 (8th Cir. 1982) (concluding officer who photographed tire tracks around front porch of a rural home did not invade the home's curtilage). The officers' entry onto the porch, for the purpose of knocking on the front door, did not violate Larson's Fourth Amendment rights.

*Seizure of building*

Larson asserts the officers effectively seized the building, within the meaning of the Fourth Amendment, when they remained on the front porch after Blake initially told them Jones was not inside. In support of his argument, Larson cites United States v. Jacobsen, 466 U.S. 109, 113 (1984), where the Court held that a "seizure" of property occurs when there is some meaningful interference with an individual's possessory interests in that property.

Larson's argument finds no evidentiary support in the record. Although it is true that Knowles and Powell remained on the front porch of the building after Blake initially told them Jones was not inside, there is no indication that the detectives or the uniformed officers supporting them took dominion and control of the building. Indeed, the contrary is true, since Knowles and Powell made no attempt to enter the building, but instead continued to knock in an attempt to persuade Blake to either step outside or allow them inside. Further, Larson fails to explain why Blake and the other occupants of the building

-15-

could not have ignored the officers and gone about their own affairs after Blake initially told the officers that Jones was not there. Stated differently, Larson fails to establish that the officers' conduct outside the building "would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter." Florida v. Bostick, 501 U.S. 429, 439 (1991); cf. United States v. Jerez, 108 F.3d 684, 691-92 (7th Cir. 1997) (recognizing that a "knock and talk" is ordinarily consensual unless coercive circumstances such as unreasonable persistence by the officers turn it into an investigatory stop).

*Voluntariness of consent*

Although Larson asserts that consent to enter the building was not voluntarily given, it is unclear from his appellate brief whether he is focusing on the consent he gave to Detective Bufton, the consent that Blake gave to Detective Knowles, or both. Government witnesses testified at the evidentiary hearing that both Larson and Blake gave consent to enter the building, but the district court made factual findings only with regard to the consent given by Blake. Accordingly, we assume that Larson's argument focuses solely on Blake's consent.

The district court found that the officers individually questioned the three occupants after they initially came out of the building, and that none of the occupants were "handcuffed or placed under arrest" during the questioning. ROA, Vol. I, Doc. 135

at 3. The court further found that "Blake gave permission for the officers to enter the [building] for the purpose of searching for T.K. Jones." Id. Based upon these findings, the court concluded that Blake's "consent . . . was given voluntarily." Id. at 4.

"Whether voluntary consent was given is a question of fact, determined by the totality of the circumstances and reviewed for clear error." United States v. Zubia-Melendez, 263 F.3d 1155, 1162 (10th Cir. 2001). "The government bears the burden of proving the consent was voluntary," and "must show there was no duress or coercion, express or implied, that the consent was unequivocal and specific, and that it was freely and intelligently given." United States v. Hernandez, 93 F.3d 1493, 1500 (10th Cir. 1996).

After reviewing the transcript of the evidentiary hearing, we conclude the district court's finding of voluntariness was not clearly erroneous. As the district court found, none of the occupants of the building were arrested or handcuffed after they voluntarily came out of the building. Instead, law enforcement officers spoke to them individually. During the course of her conversation with Knowles, Blake gave Knowles permission to enter the building to "look . . . just for TK." ROA, Vol. II at 100. Detective Powell overheard Blake's grant of consent to Knowles. Notably, Blake did not testify at the evidentiary hearing, and thus there is no testimony contradicting the officers' testimony regarding Blake's grant of consent.

-17-

*Keys to shop area*

Both Larson and Blake assert that the search of the shop was improper because it occurred only after Detective Knowles took the keys to the shop door from Blake and opened the door. Since there is no evidence, however, that Blake attempted to prevent Knowles from unlocking the shop door or otherwise attempted to revoke the consent she initially gave to Knowles to enter the building and search for Jones, the real issue is whether Knowles' entry into the shop exceeded the scope of Blake's consent.

"The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness--what would the typical reasonable person have understood by the exchange between the officer and the suspect?" Florida v. Jimeno, 500 U.S. 248, 251 (1991). The scope of consent to search is a question of fact subject to review only for clear error. See United States v. Pena, 920 F.2d 1509, 1514 (10th Cir. 1990).

The district court found that Blake's consent to search "extend[ed] to any area of the dwelling that T.K. Jones could have possibly . . . been located," including "the locked room where the methamphetamine laboratory was located." ROA, Vol. I, Doc. 135 at 5. After reviewing the record on appeal, we are unable to conclude this finding was clearly erroneous. As previously discussed, Blake agreed to let Knowles and the other officers enter the building for the purpose of looking for Jones. Obviously, this consent extended to any area in the building where a person could hide. Thus, it was reasonable for

Knowles and the other officers to conclude they were free to look in any room in the building, including the locked shop area. Blake was close to Knowles when he encountered the locked door and responded "yes" when Knowles asked her if her keys would unlock the shop door. Further, Blake did not object when Knowles took the keys, opened the door, and entered the shop. In light of all these circumstances, we conclude the district court was correct in finding that the search of the shop was within the scope of Blake's consent.

*Lack of warrant/false pretenses*

Blake asserts that the search of the building was improper because the officers did not have a search warrant and used false pretenses, i.e., a supposed interest in locating Jones, for approaching and ultimately entering the building. We disagree. The "knock and talk" strategy utilized by the officers in this case has been described as a "reasonable investigative tool" for purposes of "seek[ing] to gain an occupant's consent to search." United States v. Jones, 239 F.3d 716, 720 (5th Cir. 2001). The fact that the officers approached the building without a search warrant was not constitutionally problematic. Further, the district court found that "[t]he purpose of the 'knock and talk' was to ascertain whether or not T.K. Jones was at the [building]." ROA, Vol. I, Doc. 135 at 2. Although Blake suggests this purpose was false, she points to no evidence that would render the court's factual finding clearly erroneous.

III.

In its cross-appeal, the government challenges the district court's decision to depart downward from the guideline range in sentencing Blake.[3]  The validity of a district court's sentencing departure depends upon four inquiries: (1) whether the factual circumstances supporting a departure are permissible departure factors; (2) whether the departure factors relied upon by the district court remove the defendant from the applicable guideline heartland thus warranting a departure; (3) whether the record sufficiently supports the factual basis underlying the departure; and (4) whether the degree of departure is reasonable.  United States v. Goldberg, 295 F.3d 1133, 1137 (10th Cir. 2002).  We review these factors under a unitary abuse-of-discretion standard.  Id.  In applying this standard, we "'need not defer to the district court's determination of an issue of law.'"  Id. (quoting United States v. Bennally, 215 F.3d 1068, 1073 (10th Cir. 2000)). Substantial deference must be granted to the district court, however, when reviewing determinations that are "primarily . . . factual."  Id.

The government asserts the district court's departure was improper because Blake did not receive credit for acceptance of responsibility, which the government asserts is a prerequisite to a downward departure based on post-offense rehabilitation, because Blake's post-offense rehabilitation was not present to such an exceptional degree that it

_____

   [3]  The district court departed from the recommended guideline range of 360 months to life down to 210 months, a sentence that would be comparable to an offense level of 36, rather than the offense level of 42 that applied to Blake.

went beyond the contemplation of the guidelines or otherwise removed her from the heartland of the guideline range, and because the district court failed to articulate any reasoned justification for the degree of the departure. We reject the first two arguments, but agree with the last one.

*Lack of downward adjustment pursuant to § 3E1.1*

The government concedes that post-offense rehabilitation "may provide a basis for departure." United States v. Whitaker, 152 F.3d 1238, 1240 (10th Cir. 1998). The government notes, however, that § 3E1.1 of the guidelines allows a sentencing court to consider a defendant's "post-offense rehabilitative efforts" in deciding whether a defendant is entitled to a downward adjustment for acceptance of responsibility. See U.S.S.G. § 3E1.1 cmt. n.1(g). In light of § 3E1.1, the government asserts that a defendant must first establish entitlement to a downward adjustment for acceptance of responsibility in order to be entitled to a downward departure based upon post-offense rehabilitative efforts. Only then, asserts the government, can a defendant argue that post-offense rehabilitative efforts are so extraordinary as to justify a downward departure. Because the government did not assert this argument in the district court, it has been waived for purposes of appeal. E.g., United States v. DeLuca, 269 F.3d 1128, 1135 (10th Cir. 2001).

*Extent of Blake's post-offense rehabilitative efforts*

The government next argues that, even assuming a departure was permissible in the absence of a § 3E1.1 adjustment, Blake's post-offense rehabilitative efforts were not

-21-

so extraordinary as to justify a departure.  Generally speaking, the circuits are in agreement that, to warrant departure, post-offense rehabilitative efforts must be "extraordinary or exceptional when compared to the rehabilitation of other defendants." United States v. Rudolph, 190 F.3d 720, 728 (6th Cir. 1999).  As one court has indicated, "[t]he touchstone of extraordinary rehabilitation is a fundamental change in attitude." United States v. Craven, 239 F.3d 91, 100 (1st Cir. 2001).

Here, Blake asserted, and the district court agreed, that her efforts were extraordinary.  Those efforts, recounted in Blake's "Position with Respect to Sentencing," include completion of a Coffee Klatch series (allegedly involving women's health issues) and a Cocaine Anonymous program, attendance at the Uplift Self Image Program, active participation in the Alcoholics Anonymous program and the Cornerstone program, and enrollment in Bible study classes and LDS volunteer associations.  At sentencing, the district court stated it "ha[d] not seen this much" effort "ever[] before" on the part of a criminal defendant.  Id., Vol. VIII at 17-18.

Although the evidence presented by Blake in support of the requested departure seems relatively sparse, we are unable to conclude the district court abused its discretion in characterizing Blake's rehabilitation efforts as "extraordinary."  See Koon, 518 U.S. at 98 ("A district court's decision to depart from the Guidelines . . . will in most cases be due substantial deference, for it embodies the traditional exercise of discretion by a sentencing court."); U.S.S.G. § 3E1.1 cmt. n.5 (noting that, because "[t]he sentencing

-22-

judge is in a unique position to evaluate a defendant's acceptance of responsibility," "the determination of the sentencing judge is entitled to great deference on review"). In particular, there is at least some evidence in the record indicating that Blake participated in a variety of post-offense rehabilitation programs and made a concerted effort to change her attitude and circumstances. Further, the district court obviously drew comparisons between Blake and other criminal defendants.

*Degree of departure*

The government asserts that the degree of the departure was unreasonable. We "afford the trial court some discretion" in determining the appropriate degree of departure, and do "not lightly overturn determinations of the appropriate degree of departure." Goldberg, 295 F.3d at 1138 (internal quotations omitted). "Nevertheless, we have consistently required" a sentencing court to "specifically articulate reasons for the degree of departure using any reasonable methodology hitched to the Sentencing Guidelines, including extrapolation from or analogy to the Guidelines." Id. (italics and internal quotations omitted).

Here, the district court offered little rationale for its degree of departure, stating:

> Some of the arguments of relatives and friends, of course, are – such as "Give her a second chance," I mean if that's a plea that she go on probation or something, that's well beyond my discretion in this kind of a case where a jury convicted her and suggest that I have really more power than I do.
> But the presentence report has her at a 2 and a 42. I'm going [to] depart downward to a 36 for extraordinary post-offense rehabilitation. I have not seen this much, I don't know, [ever] before, and that would give

-23-

her a guideline range of 210 to 262, but I have to tell you that – and for the
reasons you've stated in your brief and orally – but it may be slightly
beyond my discretion. If the government appeals, that may be overturned.
You understand that risk, of course.

ROA, Vol. VIII at 17-18.

We conclude the district court's rationale was insufficient to satisfy our

"reasonable methodology" requirement. In particular, there is no indication that the

district court extrapolated from or drew analogies to any other portions of the Guidelines,

or offered any principled justification for its departure determination. Instead, it appears

the court picked a sentence it believed was less severe and reduced Blake's offense level

by six levels to achieve that result. Accordingly, the district court abused its discretion in

determining the degree of departure. See Goldberg, 295 F.3d at 1140 (citing with

approval cases from other circuits rejecting similar departure decisions); see also id. at

1142 (noting "that a departure of eight levels is remarkable and must be reserved for truly

extraordinary cases"). In her answer brief on cross-appeal, Blake agrees "that a remand is

appropriate in order for the court to state its reasons explaining the degree of the

departure." Br. at 5.

With respect to cases No. 02-4013 and No. 02-4016, we AFFIRM the judgment of

the district court. With respect to case No. 02-4034, we REVERSE Blake's sentence and

REMAND to the district court for resentencing.

Entered for the Court

Mary Beck Briscoe
Circuit Judge

-24-