**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**DEC 15 2000**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

JOSE BUSTILLOS-MUNOZ,

    Defendant-Appellant.

No. 99-1397

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**(D.C. No. 99-CR-42-B)**

---

David C. Japha of Zapiler, Ferris & Rhodes L.L.C., Denver, Colorado for Appellant.

James C. Murphy, Assistant United States Attorney (Thomas L. Strickland, United States Attorney, Denver, Colorado, with him on the brief) for Appellee.

---

Before **EBEL, HOLLOWAY** and **MURPHY**, Circuit Judges.

---

**HOLLOWAY**, Circuit Judge.

---

Defendant/Appellant Jose Bustillos-Munoz was charged with possession with intent to distribute cocaine and with aiding and abetting that offense. Bustillos-Munoz moved to suppress drugs (four kilos of cocaine) and an incriminating statement he made. The government opposed the suppression motion and the case is before us following a

conditional plea of guilty entered with reservation of Defendant's issues challenging the denial of suppression. We have jurisdiction pursuant to 28 U.S.C. § 1291.

**I**

**A**

On January 23, 1999, in the early morning hours (12:30 a.m.) Colorado Trooper Cox was traveling north on Interstate 25 about one mile north of Pueblo, Colorado. A white Hyundai vehicle passed which had Arizona license plates. The headlights of the Hyundai shined brightly in the rear view mirror of Trooper Cox, causing him to believe the driver had failed to dim his high beam headlights in violation of Colorado law. Trooper Cox allowed the Hyundai to pass and then stopped the vehicle. Bustillos-Munoz immediately came out from the driver's side, causing Trooper Cox to become suspicious.

Trooper Cox exited his vehicle and met Bustillos-Munoz at the rear of the white Hyundai. Bustillos-Munoz said he was not driving with his high beam lights activated. Trooper Cox walked to the driver's side door. Bustillos-Munoz joined him and reached into the car and activated the high beam headlight so as to show Trooper Cox that the high beam headlights were not in use. Trooper Cox told Bustillos-Munoz his headlights must not be in alignment.

Both men walked around to the front of the white Hyundai. After they looked at

- 2 -

the headlights, Trooper Cox told Bustillos-Munoz to have them fixed as soon as possible because they appeared not to have been maintained properly.

Trooper Cox had brief conversation with Bustillos-Munoz and then went back to his patrol car where he contacted the dispatcher who verified Bustillos-Munoz's driver's license and vehicle registration. Trooper Cox learned that: the driver's license and registration were valid; no arrest warrants were issued for Bustillos-Munoz; and he had been fingerprinted for some unknown reason. Trooper Cox walked back to Bustillos-Munoz's vehicle, handed him back his driver's license and registration, told him to have the headlights repaired as soon as possible, and advised him he was free to leave. Some 15 minutes passed between the time Trooper Cox stopped Bustillos-Munoz and the time when Trooper Cox advised Bustillos-Munoz he was free to leave.

Bustillos-Munoz then turned and walked toward the driver's side of his vehicle. Trooper Cox asked him whether he had any weapons and Bustillos-Munoz said no. Trooper Cox then asked him if he had any drugs in the vehicle and Bustillos-Munoz dropped his head, and shook his head side to side and said no. Trooper Cox then asked for permission to search the white Hyundai and Bustillos-Munoz assented. Trooper Cox never informed Bustillos-Munoz that he need not respond to questions or consent to the search of his vehicle.

Trooper Cox began a search of the vehicle by asking Bustillos-Munoz to open the trunk. Bustillos-Munoz opened the trunk release and then both men walked to the back

of the white Hyundai. Trooper Cox frisked Bustillos-Munoz for weapons and directed him to stand at the front of the patrol car during the search. Trooper Cox searched the trunk and found fabrics, vases, etc., but nothing illegal.

Trooper Cox then tried to open the passenger door, but it was locked. Bustillos-Munoz walked to the front passenger door, without prompting, and unlocked it. Trooper Cox reached inside the door, unlocked the rear passenger door, and began to search the back seat. He unzipped a cloth duffle bag, felt something hard and large in it, and removed it from the bag. This revealed a kilogram size vacuum sealed plastic bag which he believed to contain methamphetamine. Bustillos-Munoz said he did not know what it was. Trooper Cox advised Bustillos-Munoz of his Miranda rights and placed him under arrest.

After Bustillos-Munoz was placed under arrest, Trooper Cox returned to the white Hyundai and found three more bags of what he believed was methamphetamine. Trooper Cox transported Bustillos-Munoz and the white Hyundai to the Colorado Patrol Office in Pueblo. A field test was performed there on the packages (the vacuum sealed bags) and the test indicated the bags contained cocaine.

Throughout their conversation, Trooper Cox and Bustillos-Munoz conversed in English. Bustillos-Munoz did not attempt to communicate in Spanish, which is his native tongue. Trooper Cox does not speak Spanish fluently or know the proper words for search, seizure, consent, refuse, submit, cease, or intrusion. Although Bustillos-

Munoz spoke English with a foreign accent, Trooper Cox did not have any difficulty understanding Bustillos-Munoz and Bustillos-Munoz never expressed any difficulty in understanding Trooper Cox.

After Bustillos-Munoz was transported to the Pueblo Patrol Office, he was interviewed by Deputy Sheriff Thurston and Colorado Patrol Trooper Powell. The interview started at about 1:30 a.m. on January 23, 1999. Before questioning Bustillos-Munoz, Deputy Thurston, who was assigned to the Drug Enforcement Agency's Southern Colorado Drug Task Force, told Bustillos-Munoz he desired to advise him of his rights and then question him about the substance found in the white Hyundai. Bustillos-Munoz assented. The two men spoke in English and Bustillos-Munoz did not seem to have any difficulty understanding Deputy Thurston. Thurston, who does not speak Spanish, understood Bustillos-Munoz even though the English Bustillos-Munoz spoke was with a foreign accent.

Deputy Thurston asked Bustillos-Munoz whether he preferred to read the English language or Spanish language, and Bustillos-Munoz responded that he read Spanish more easily. Deputy Thurston filled out the top portion of a CSP Miranda Advisement Form written in Spanish, noting Bustillos-Munoz's name, date of birth (6-20-69), the location, date, and time of the interview, and the suspected crime of possession of cocaine. Deputy Thurston instructed Bustillos-Munoz to read aloud and in the Spanish language several advisements written on the form. After Bustillos-Munoz read each

advisement aloud, Deputy Thurston asked him whether he understood the right involved, and Deputy Thurston advised Bustillos-Munoz to write his initials next to the advisement if he understood it. Bustillos-Munoz then read aloud and placed his initials on the renunciation of rights section of the form, indicating waiver of his rights to remain silent and have an attorney present during questioning. Both men signed and dated the advisement form. Bustillos-Munoz never indicated he did not understand the advisements.

Ms. Salazar, the court interpreter, translated the advisement form used by Deputy Thurston into English during the suppression hearing. But for one misspelled word, the first advisement initialed by Bustillos-Munoz states: "You have the right to remain silent, and you are not obligated to answer any of our questions." The second advisement reads: "Any statement that you make may be used against you in a trial/judgment of court." The third advisement states: "You have the right to consult with an attorney and to have him present during this questioning." Order at 21, Attachment 2 to Appellant's Opening Brief.

Regarding the fourth advisement, Ms. Salazar testified that a pronoun was missing, leading to the following translation: "If you cannot pay for an attorney the State of Colorado will provide one for you, and you have the right to be present during the questioning." The fifth advisement also contains a typographical error rendering it susceptible to two possible translations: (1) "If you have decided to answer our questions

without an attorney present, you still have the right to change your mind and not answer more to these questions until you consult with an attorney." or (2): "<u>Yes</u>, you have decided to answer our questions without an attorney present. You still have the right to change your mind and not answer more to these questions until you consult with an attorney." (emphasis added).

Ms. Salazar also translated the renunciation of rights section of the CSP form. The first sentence reads: "I wish to answer the questions and waive my right to remain silent." After that sentence, Bustillos-Munoz wrote his initials next to the word "Si," which means "yes" in English. The second sentence states: "I wish to have an attorney present during questioning." Following that sentence Bustillos-Munoz wrote his initials next to the word "NO" which means "no" in English. Just above his signature the following paragraph appears which, but for one misspelled word, states:

> I have read and understood this statement of rights. I am willing to answer any question that is asked. This waiver of rights is voluntary and the agents of the State Patrol of Colorado have not made me any promise, threat or obligation. For now, I do not wish to have an attorney present during questioning.

Bustillos-Munoz signed and dated the form beneath that paragraph.

Ms. Salazar, who served as interpreter for Bustillos-Munoz on three occasions, also testified that Bustillos-Munoz is not fluent in English and has difficulty understanding English legal terminology. Although the judge found that Ms. Salazar testified credibly regarding her observations of Bustillos-Munoz, he did not find her

testimony as probative of his actual ability to communicate in English. Indeed when she observed Bustillos-Munoz he had already been arrested and detained. The judge said he found the testimony of Trooper Cox and Deputy Thurston more persuasive on that issue.

After Bustillos-Munoz executed the written waiver, Deputy Thurston asked him about the cocaine found in the white Hyundai. Bustillos-Munoz said he received the cocaine from a friend in Phoenix, Arizona and that his friend would expect payment of $14,000 after the cocaine was resold.

Scott McGinniss, a Colorado State Patrol Investigator, inspected and impounded the white Hyundai to determine whether the headlights were functioning correctly. He observed that the headlight buckets were not securely fastened to the radiator core support; a plastic fastener used to secure the right headlight was broken; the right side of the bumper cover was attached to the right fender with what appeared to be a paper clip; the inner fender of the right front wheel-well was missing; the inner fender of the left front wheel-well had dropped from the position it was normally in, allowing the left front tire to erode a hole in the inner fender; and the original hood had been replaced. Officer McGinniss concluded, based on his inquiries, that the headlights were not properly adjusted and the white Hyundai had been rebuilt from salvage.

Based on an unopposed proffer, the judge found that Bustillos-Munoz was born in Mexico and educated in Mexican schools until he quit school to go to work in the sixth grade. He found that the Spanish language is Bustillos-Munoz's primary language, his

parents did not speak English in the family home, and he has lived in the United States for three to five consecutive years.

The above are findings of fact stated by the trial judge on the basis of the evidence at the suppression hearing.

**B**

We turn now to the judge's treatment in his order of the issues which are raised in this appeal.

The trial judge first addressed Bustillos-Munoz's contention that the initial investigatory stop was illegal because the facts fail to support the existence of reasonable suspicion of criminal activity. Under Terry v. Ohio, 392 U.S. 1 (1968), a law enforcement officer may stop and briefly detain a person for investigative purposes "if the officer has a reasonable suspicion . . . that criminal activity 'may be afoot.'" United States v. Sokolow, 490 U.S. 1, 7 (1989). An officer must be able to point to specific and articulable facts to support a finding of reasonable suspicion; an inchoate and unparticularized suspicion or hunch is insufficient. Terry, 392 U.S. at 21. Based on these authorities and others, the judge concluded that Trooper Cox had a reasonable, articulable suspicion that a traffic or equipment violation had occurred at the time he stopped Bustillos-Munoz. Specifically, Cox observed what he reasonably believed to be a violation of the prohibition on use of high beam headlights when following another

vehicle within two hundred feet to the rear.

The judge also found unconvincing Bustillos-Munoz's contention that there was evidence suggesting the investigative stop was pretextual. Investigator McGuinness's analysis of the white Hyundai corroborates Trooper Cox's observation that the headlights were not adjusted properly. The judge rejected Bustillos-Munoz's suggestion that Trooper Cox targeted him because of his race or national origin, finding no evidence to support that allegation. The white Hyundai had dark tinted windows, Arizona license plates, and the investigative stop occurred in the middle of the night. Thus the judge concluded that the initial investigative stop did not violate the Fourth Amendment.

The judge next considered whether the request for Bustillos-Munoz's driver's license and registration and inquiry about his travel plans violated the Fourth Amendment. The judge said that it was well established that during a routine traffic stop, the detaining officer may request a driver's license and vehicle registration, run a computer check on the car and driver, and issue a citation. United States v. Pena, 920 F.2d 1509, 1514 (10th Cir 1990). The judge concluded that because Trooper Cox acquired an objectively reasonable and articulable suspicion that Bustillos-Munoz violated a traffic law, Trooper Cox was constitutionally permitted to inquire about Bustillos-Munoz's travel plans during the investigative stop, which constituted a detention.

Moreover, the judge concluded that Trooper Cox ended the detention when he

returned Bustillos-Munoz's driver's license and registration and then informed him he was free to leave. From that point on and until Bustillos-Munoz's arrest for possession of a controlled substance, Trooper Cox and Bustillos-Munoz were engaged in an ordinary consensual encounter.

The judge then turned to consider whether Bustillos-Munoz voluntarily consented to a search of his vehicle. Bustillos-Munoz argued that his consent was involuntary, and that the government bears the burden of proof regarding the issue of consent and must show that the consent was unequivocal and specific and that it was freely and intelligently given. The judge concluded that it was uncontroverted that Trooper Cox returned to Bustillos-Munoz his documentation and informed him he was free to leave before asking him if he had anything illegal in the vehicle. There is no evidence of any coercion by Trooper Cox. Even considering Bustillos-Munoz's abbreviated education and foreign ancestry, the judge concluded he voluntarily consented to the search of his vehicle.

The judge then considered whether Trooper Cox's search of the bag went beyond the scope of Bustillos-Munoz's consent. The judge applied the "objective reasonableness" test, asking what the typical reasonable person would have understood to be the scope of his or her consent under the circumstances. The judge concluded that, applying objective reasonableness to the circumstances, a reasonable person would have understood that the scope of Bustillos-Munoz's consent to search extended to the bag in

his white Hyundai. Trooper Cox specifically asked about weapons and drugs, which could have been contained in the bag he subsequently searched. At no time did Bustillos-Munoz revoke his consent or say that his consent did not extend to bags or other containers within the white Hyundai. Accordingly, the judge concluded that Trooper Cox did not violate the Fourth Amendment by searching the bag in the white Hyundai.

The judge next considered whether Bustillos-Munoz's waiver of rights was voluntary, knowing, and intelligent. The judge found that Bustillos-Munoz was able to communicate effectively with Trooper Cox and Deputy Thurston in English. Although Munoz's primary language is Spanish, he understood and conversed in English well enough to comprehend the substance of the communications. At no time did he express difficulty in understanding a statement, question, or directive. He communicated detailed facts to Trooper Cox and Deputy Thurston, neither of whom had difficulty understanding his attempts to communicate.

The judge also concluded that, although imperfect, the Colorado State Police advisement form adequately advised Bustillos-Munoz of his constitutional rights, and so his Miranda warnings were adequate. He thus found that Bustillos-Munoz's confession was voluntary, knowing, and intelligent. Although his education was abbreviated, he was twenty-nine years of age at the time of his waiver, there was no evidence of low intelligence, and he was detained for less than two hours before he waived his rights.

Moreover, the judge found no evidence of coercion, physical abuse, or other improper tactics during that time, and Bustillos-Munoz had been advised of his constitutional rights twice, once verbally in the English language and once in writing in the Spanish language. He was also advised of the suspected crime before he waived his rights. The judge concluded therefore that Bustillos-Munoz had a full awareness of both the nature of the rights being abandoned and the consequences of the decision to abandon them. Therefore the judge denied the motion to suppress his incriminating statement. Bustillos-Munoz now appeals the trial judge's denial of his motion to suppress the cocaine found in his car and his incriminating statement.

We will turn next to Bustillos-Munoz's claims of error in the judge's ruling.

## II

When reviewing a denial of a motion to suppress, we "accept the district court's factual findings unless clearly erroneous," and view the evidence in the light most favorable to the government. United States v. Elliott, 107 F.3d 810, 813 (10th Cir. 1997). However, we review de novo the ultimate determination of the reasonableness of the search under the Fourth Amendment. Id.

## III

### A

Defendant Bustillos-Munoz first argues that the trial court erred in denying his motion to suppress the cocaine found in his car because Trooper Cox's initial stop of him was pretextual and thus violated the Fourth Amendment. We disagree.

The Supreme Court has held that traffic stops are seizures within the meaning of the Fourth Amendment. Delaware v. Prouse, 440 U.S. 648, 653 (1979) ("The Fourth and Fourteenth Amendments are implicated in this case because stopping an automobile and detaining its occupants constitute a 'seizure' within the meaning of those Amendments, even though the purpose of the stop is limited and the resulting detention quite brief."); see also Berkemer v. McCarty, 468 U.S. 420, 436 (1984). Under the law of this circuit, we examine traffic stops using the same standards as an examination of an investigative detention, i.e., a Terry stop. United States v. Botero-Ospina, 71 F.3d 783, 786 (10th Cir. 1995) (en banc) ("We therefore analyze [traffic stops] under the principles pertaining to investigative detentions set forth in Terry v. Ohio."); United States v. Walker, 933 F.2d 812, 815 (10th Cir. 1991) ("[W]e have judged the reasonableness of traffic stops under the principles pertaining to investigative detentions announced in Terry v. Ohio."). Consequently, we must determine whether the investigative detention was reasonable by making a two-part inquiry. First, we ask whether "the officer's action was justified at its inception." Botero-Ospina, 71 F.3d at 786 (quoting Terry v. Ohio, 392 U.S. 1, 20 (1968)). Second, we ask whether the officer's action "was reasonably related in scope to the circumstances which justified the interference in the first place." Id. (quoting Terry,

392 U.S. at 20).

In the instant case, Bustillos-Munoz argues that Trooper Cox's decision to stop him was invalid because "Trooper Cox was unable to articulate any particular statute that Mr. Bustillos-Munoz violated." Appellant's Opening Brief at 16-17. Moreover, the Defendant argues that the ostensible reason for the stop – Trooper Cox's alleged observation that the Bustillos-Munoz's headlights were too bright – does not amount to a criminal violation of Colorado law. Id. at 13. This argument is unpersuasive. In Botero-Ospina, 71 F.3d at 787, we adopted a new standard for assessing the constitutionality of a traffic stop. Henceforth, a traffic stop would be "valid under the Fourth Amendment if the stop is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring." Consequently, we held that for purposes of Fourth Amendment analysis, it is "irrelevant" whether the officer "may have had other subjective motives for stopping the vehicle." Id. As a result, the only question to be addressed is whether the officer "had reasonable suspicion that this particular motorist violated 'any one of the multitude of applicable traffic and equipment violations' of the jurisdiction." Id. (quoting Prouse, 440 U.S. at 661) (emphasis added).

Under this standard, we have little trouble concluding that Trooper Cox's decision to stop Bustillos-Munoz was "justified at its inception." The trial judge found that Bustillos-Munoz's headlights "shined brightly in the rear-view mirror of Trooper Cox's

- 15 -

patrol car, causing him to believe that the driver of the white Hyundai failed to dim his high-beam headlights in violation of Colorado statutory law." Appellant's Opening Brief, Appendix 2, at 2 (Order of the District Court). Since we find that this conduct violates Colorado law, namely Colo. Rev. Stat. § 42-4-217, we believe that it was a sufficient basis upon which Trooper Cox could conduct a traffic stop.[1]

Bustillos-Munoz argues that our opinion in United States v. Gregory, 79 F.3d 973

---

[1]Colorado Rev. Stat. § 42-4-217 provides:

Use of multiple-beam lights

(1) Whenever a motor vehicle is being operated on a roadway or shoulder adjacent thereto during the times specified in section 42-4-204, the driver shall use a distribution of light, or composite beam, directed high enough and of sufficient intensity to reveal persons and vehicles at a safe distance in advance of the vehicle, subject to the following requirements and limitations:
(a) Whenever a driver of a vehicle approaches an oncoming vehicle within five hundred feet, such driver shall use a distribution of light or composite beam so aimed that the glaring rays are not projected into the eyes of the oncoming driver. The lowermost distribution of light or composite beam specified in section 42-4-216(1)(b) shall be deemed to avoid glare at all times, regardless of road contour and loading.
(b) Whenever the driver of a vehicle follows another vehicle within two hundred feet to the rear, except when engaged in the act of overtaking and passing, such driver shall use a distribution of light permissible under this title other than the uppermost distribution of light specified in section 42-4-216(1)(a).
(2) Any person who violates any provision of this section commits a class A traffic infraction.

(10th Cir. 1996), requires a different result. We do not agree. In that case, on a clear and windy day at 6:00 p.m., a police officer noticed the defendant driving a U-haul truck along a winding roadway in the mountainous high desert. Id. at 975. The officer testified that he saw the defendant's truck cross two feet into the right shoulder of the emergency lane of the highway, and that crossing into the emergency lane is a violation of Utah law and could be a sign that the driver was sleepy or was intoxicated. Id. at 975-76. The officer further testified that he stopped the truck because of this alleged traffic violation and to see if the driver was awake, but that he did not intend to conduct a DUI investigation. Id. at 976. After obtaining the driver's license, the officer did nothing to determine whether the driver was impaired, other than asking whether he was "awake." Id. The magistrate made a finding, which was adopted by the district court, that the driver's brief entrance into the emergency lane violated a Utah statute that a vehicle be operated "as nearly as practical entirely within a single lane . . ." Id. at 978 (quoting Utah Code Ann. § 41-6-61(1)). Moreover, the magistrate found that the act of crossing into the emergency lane gave rise to a reasonable suspicion that the driver was impaired by alcohol or lack of sleep. Id. We disagreed, and ruled that we "do not find that an isolated incident of a vehicle crossing into the emergency lane of a roadway is a violation of Utah law." Id.

Bustillos-Munoz's assertion notwithstanding, we do not believe that Gregory controls our decision here. Gregory was premised on the fact that in the Utah

Court's interpretation of the relevant statute, an isolated incident of a vehicle crossing into the emergency lane of a roadway is <u>not</u> a violation of the law. We noted that in <u>State of Utah v. Bello</u>, 871 P.2d 584, 586 (Utah App. 1994), the state court had held that a single instance of weaving does not constitute a violation of the Utah statute. Thus, we followed the Utah Court's ruling in <u>Bello</u> that the statute "requires only that the vehicle remain entirely in a single lane '<u>as nearly as practical</u>.'" <u>Gregory</u>, 79 F.3d at 978 (emphasis added). Consequently, we concluded that in the circumstances – a winding road, mountainous terrain, and windy weather conditions – the fact that the vehicle once moved onto the shoulder of the road did not give rise to a suspicion of criminal activity. <u>Id.</u> Thus, the officer violated the driver's rights under the Fourth Amendment.[2] <u>Id.</u>

Gregory is distinguishable from the issue presented here. Unlike in <u>Gregory</u>, where the statute which the defendant had allegedly violated provided that a vehicle must stay within its lane "as nearly as practical," the Colorado statute which Defendant Bustillos-Munoz allegedly violated provides no such leeway. Rather, the statute states that under <u>all</u> circumstances, "the driver of a vehicle following another vehicle within two hundred feet to the rear, except when engaged in the act of overtaking and passing, such driver shall use a distribution of light permissible under this title other than the

---

[2]We also rejected the magistrate's and the district court's alternative ground for justifying the stop of the defendant's vehicle, that his driving gave rise to a reasonable suspicion that the defendant was impaired by alcohol or by lack of sleep. <u>Gregory</u>, 79 F.3d 973, 978.

uppermost distribution of light specified in section 42-4-216(1)(a)." Colo. Rev. Stat. § 42-4-217(1)(b). As a result, Trooper Cox could have a reasonable suspicion that Bustillos-Munoz had committed a traffic violation, albeit a minor one. Accordingly, we conclude that the trial judge's ruling that the traffic stop was justified at its inception was not in error.

## B

Defendant Bustillos-Munoz next argues that Trooper Cox violated the Fourth Amendment by requesting his license and registration after the initial purpose of the stop had been satisfied, i.e., determining that Bustillos-Munoz did not violate the statute regulating the use of high beam headlights. Bustillos-Munoz argues that "once the trooper satisfied himself that the purpose of the stop was accomplished and there was no further suspicious criminal behavior, the matter was over." Thus, Bustillos-Munoz argues, "[r]equesting the documents was in violation of the Fourth Amendment." Appellant's Opening Brief at 18.

We do not agree. Although it is true that Trooper Cox quickly determined that Bustillos-Munoz's high-beams were not on and thus that he was not in violation of Colo. Rev. Stat. § 42-4-217(1)(b), his investigation revealed that Bustillos-Munoz's headlights were out of adjustment and thus in violation of the Colorado statute regulating faulty equipment: Colo. Rev. Stat. § 42-4-202 ("It is unlawful for any person to drive . . . any vehicle . . . which . . . is not at all times equipped with such lamps or other equipment in

- 19 -

proper condition and adjustment as required in this section and sections 42-4-204 to 42-4-231 . . .").

As a result, we are not persuaded by Bustillos-Munoz's argument that once Trooper Cox had determined that he had not violated the high-beam statute the reason for the stop had ended and thus his request for Bustillos-Munoz's license and registration violated the Fourth Amendment. Although an "initially valid stop can, of course, at some point become unreasonable," United States v. Pena, 920 F.2d 1509, 1514 (10th Cir. 1990), our review of the facts leads us to conclude that no such violation occurred here. Trooper Cox's reasonable suspicion that Bustillos-Munoz was in violation of the faulty equipment statute permitted him to request Bustillos-Munoz's license and registration.

**C**

Bustillos-Munoz next challenges the trial judge's determination that "Trooper Cox ended the detention when he returned Mr. Bustillos-Munoz's driver's license and registration, and then informed him he was free to leave. From that point in time until Mr. Bustillos-Munoz's arrest for possession of a controlled substance, Trooper Cox and Mr. Bustillos-Munoz were engaged in an ordinary consensual encounter." Appellant's Opening Brief, Appendix 2, at 15 (Order of the Trial Court). Instead, Bustillos-Munoz contends that he remained "seized" since it was objectively reasonable for him to believe that he was not free to terminate his conversation and leave. Id. at 21. Bustillos-Munoz

thus argues that he did not validly consent to Trooper Cox's request to search his car.

We disagree. The Supreme Court has ruled that "[s]o long as a reasonable person would feel free to 'disregard the police and go about his business, the encounter is consensual and no reasonable suspicion is required.'" Florida v. Bostick, 501 U.S. 429, 434 (1991) (quoting California v. Hodari D., 499 U.S. 621, 628 (1991)). As applied in the traffic stop context, we have held that "[u]nless the officer has returned the driver's documentation, the driver is not free to go, and the encounter is not consensual." United States v. Soto, 988 F.2d 1548, 1557 (10th Cir. 1993); see also Gregory, 79 F.3d 979 (holding that "returning a driver's documents is necessary to show that the police-citizen encounter was consensual"); Botero-Ospina, 71 F.3d at 794 ("So long as the officer retains the driver's license and registration . . . the officer cannot justify questions unrelated to the traffic stop as a consensual encounter."). In the instant case, the trial judge found that Trooper Cox had returned to Bustillos-Munoz his license and registration before conducting any further inquiry. We find that this is adequately supported by the record. Trooper Cox testified that after he was informed by the dispatcher that Bustillos-Munoz did not have a criminal history and that his license and registration were valid, he "took his paperwork back up, his documents," and "gave them back to him" and informed him that he was "free to leave." 6 R. at 12. Only then did

Trooper Cox inquire whether Bustillos-Munoz had any weapons or drugs in his car.[3] Id.

Although we have established a "bright-line rule that an encounter initiated by a traffic stop may not be deemed consensual unless the driver's documents have been returned to him," United States v. Gonzalez-Lerma, 14 F.3d 1479, 1483 (10th Cir. 1994), a finding that a driver's documentation was returned does not end the matter, as "we have specifically indicated this is not always sufficient to demonstrate that an encounter has become consensual." United States v. Elliott, 107 F.3d 810, 814 (10th Cir. 1997). Thus, returning a driver's documentation may not end the detention if there is evidence of "a coercive show of authority, such as the presence of more than one officer, the display of a weapon, physical touching by the officer, or his use of a commanding tone of voice indicating that compliance might be compelled." United States v. Turner, 928 F.2d

---

[3]At oral argument, Bustillos-Munoz argued that our recent opinion in United States v. Holt, 229 F.3d 931 (10th Cir. 2000) (rehearing granted en banc, Dec. 1, 2000), supports his position. We disagree. Holt involved the detention of a driver for failing to wear a seatbelt. The officer asked the driver to enter his patrol car and requested his license. While writing a warning for the seatbelt violation, the officer asked the driver if there were any loaded weapons in his vehicle. Id. at 933. On appeal, we ruled that since there was "no evidence in this case suggesting that [the officer] was motivated by safety concerns, nor [was] there sufficient evidence that would objectively give rise to a particularized safety concern," the officer's inquiry regarding weapons violated the Fourth Amendment. Id. at 938.

Holt does not control our decision here. Whereas in Holt the officer's question about the presence of loaded weapons was posed while the officer retained the driver's license and thus during the investigative detention, here Trooper Cox inquired about drugs only after he had returned Bustillos-Munoz's license and registration and so was in the context of a consensual encounter. As a result, Bustillos-Munoz's reliance on Holt is not persuasive.

956, 959 (10th Cir. 1991); see also Elliott, 107 F.3d at 814.  Our review of the record has

not revealed the presence of these or similar factors.[4]  Accordingly, we find that once

Trooper Cox returned Bustillos-Munoz's license and registration, the detention ended

and a consensual encounter commenced.  Thus, Bustillos-Munoz validly consented to a

search of his car and the trial judge did not err in denying Bustillos-Munoz's motion to

suppress the cocaine discovered therein.[5]


## IV

Lastly, Bustillos-Munoz argues that the judge erred in denying his motion to

---

[4]Bustillos-Munoz argues that one factor to be weighed in determining whether an encounter is consensual is whether the officer informed the defendant that he was free to leave the scene or could refuse to give consent.  Appellant's Opening Brief at 22 (citing McSwain, 29 F.3d 558, 563 (10th Cir. 1994)). Bustillos-Munoz thus argues that since the Trooper Cox did not so inform him, the encounter was not consensual.  We disagree.  As noted above, our review of the Record shows that Trooper Cox did in fact inform Bustillos-Munoz that he was "free to leave."  6 R. at 12.

[5]We likewise hold that Trooper Cox did not exceed the scope of Bustillos-Munoz's consent by searching a bag found in his car.  Where a suspect does not limit the scope of a search, and does not object when the search exceeds what he later claims was a more limited consent, an officer is justified in searching the entire vehicle.  United States v. Wacker, 72 F.3d 1453, 1470 (10th Cir. 1995); see also United States v. Pena, 920 F.2d 1509, 1515 (10th Cir. 1990) ("[F]ailure to object to the continuation of the search under these circumstances may be considered an indication that the search was within the scope of the consent."); United States v. Deases, 918 F.2d 118, 122 (10th Cir. 1990) ("Consent to search a car means to search the entire car and whatever is in it, unless such consent is otherwise restricted").  As the Supreme Court reasoned in Florida v. Jimeno, 500 U.S. 248, 251 (1991), "We think that it was objectively reasonable for the police to conclude that the general consent to search respondent's car included consent to search containers within that car which might bear drugs."

suppress his incriminating statement on the ground that he did not voluntarily, knowingly, and intelligently waive his <u>Miranda</u> rights. Bustillos-Munoz contends that his lack of English language skills and an ambiguous use of the word "si," (which can mean either "yes" or "if") on the Spanish translation of the <u>Miranda</u> warnings that he signed, render ineffective his decision to waive his <u>Miranda</u> rights.[6]

In denying Bustillos-Munoz's motion to suppress his incriminating statement, the

---

[6]Paragraph 5 of the CSP form, reads "SI, HA DECIDIDO CONTESTAR NUESTRAS REGUNTAS SIN UN ABOGADO PRESENTE, AUN ESTÁ EN SU DERECHO A CAMBIAR SU FORMA DE PENSAR Y NO CONTESTAR MÁS, A ESTÁS PREGUNTAS HASTA QUE CONSULTE CON UN ABOGADO." We believe that the intended meaning of this sentence was: "<u>If</u> you have decided to answer our questions without an attorney present you still have the right to change your mind and not answer more to these questions until you consult with an attorney." <u>Cf</u>. Appellant's Opening Brief, Appendix 2, at 26 (Order of Trial Judge).

The difficulty with the Spanish translation, however, is that when the word "sí"is written with an accent, it means "yes," but when it is written "si" (without an accent), it means "if." <u>See</u> <u>Larousse, Concise Spanish-English, English-Spanish Dictionary</u>, New Edition 1993, at 476. On the other hand, when words are written in capital letters, accents are ordinarily omitted, and when "si" is followed directly by a comma, it is read as "yes." 6 R. at 86-87 (testimony of Spanish translator). Since the word "SI" appears in capital letters and without an accent but followed by a comma, Bustillos-Munoz argues that it could have been understood to mean "<u>Yes</u>, you have decided to answer our questions without an attorney . . .," and thus that his waiver of a possibly inadequately translated right was not voluntary, knowing, and intelligent.

For the reasons set out in the text, we believe that regardless whether Bustillos-Munoz understood "SI" to mean "if" or "yes," he voluntarily, knowingly, and intelligently waived his <u>Miranda</u> rights. The trial judge's order, p. 21, found that the CSP advisement form, as translated by the interpreter "with ambiguities resolved in Mr. Bustillos-Munoz's favor," stated in part: "Yes, you have decided to answer our questions without an attorney present you still have the right to change your mind and not answer more of these questions until you consult with an attorney."

The trial judge found the entire form "sufficient to convey the essence of the <u>Miranda</u> warning" to the defendant.

trial judge considered such factors as Bustillos-Munoz's age, intelligence, and education; the length of his detention; the length and nature of the questioning; whether he was advised of his constitutional rights; and whether he was subjected to physical punishment. Appellant's Opening Brief, Appendix 2, at 19 (Order of Trial Court) (citing United States v. Glover, 104 F.3d 1570, 1579 (10th Cir. 1997)). In addition, the trial judge stated that beyond the five Glover factors, "Congress has codified five non-conclusive factors the district court shall consider when determining the voluntariness of a defendant's confession," and then quoted from 18 U.S.C. § 3501(b). Appellant's Opening Brief, Appendix 2, at 19.

Title 18 U.S.C. § 3501(b), which was a congressional attempt to replace Miranda with a generalized voluntariness test so that statements could be admitted if voluntarily given even if the suspect's Miranda warnings were deficient, was recently ruled unconstitutional. Dickerson v. United States, 120 S. Ct. 2326 (2000). Thus, our earlier opinion in United States v. Crocker, 510 F.2d 1129 (10th Cir 1975), holding that a voluntariness determination under § 3501 may make a confession admissible despite failure to comply with Miranda, is no longer of any force or effect. The fact that the judge applied the § 3501 voluntariness test does not require a reversal, however. If the judge had relied exclusively on his voluntariness finding and the provisions of § 3501 to support the admission of Bustillos-Munoz's confession without considering the sufficiency of the Miranda warning given to Bustillos-Munoz, there would be a serious

difficulty. However, that is not the case here. In addition to making a voluntariness finding, the judge also made clear that adequate <u>Miranda</u> warnings had been given to Bustillos-Munoz. Specifically, the judge found that Bustillos-Munoz had been able to communicate effectively with Trooper Cox and Deputy Thurston in English, and that "although imperfect the CSP [Colorado State Patrol] advisement form adequately advised Mr. Bustillos-Munoz of his constitutional rights . . ."

We agree and are satisfied that the CSP form adequately conveyed to Bustillos-Munoz his <u>Miranda</u> rights and that Bustillos-Munoz could communicate sufficiently in English with Trooper Cox and Deputy Thurston to render his waiver effective. Deputy Thurston testified that although Bustillos-Munoz spoke with an accent, "we were able to converse in English with no problem." 6 R. at 73; <u>see</u> <u>also</u> 3 R. at 20 (Deputy Thurston stated that "we were able to communicate with no problems"). Likewise, Trooper Cox testified that Bustillos-Munoz did not appear to have any difficulty understanding him. 6 R. at 14. Nor are we persuaded by Bustillos-Munoz's contention that possible confusion between different translations of the word "si" renders his <u>Miranda</u> warnings invalid, as we conclude that the CSP form sufficiently conveyed to him the "substance" or "essence" of his <u>Miranda</u> rights. <u>United States v. Hernandez</u>, 93 F.3d 1493, 1502 (10th Cir. 1996). Indeed, the warning which Bustillos-Munoz disputes (informing him that even if he decided to answer questions without an attorney present, he had the right to change his mind and to request consultation with an attorney), is <u>not</u> one of the warnings required by

the Miranda decision. As the Supreme Court recently stated, Miranda:

> laid down "concrete constitutional guidelines for law enforcement agencies and courts to follow." Those guidelines established that the admissibility in evidence of any statement given during custodial interrogation of a suspect would depend on whether the police provided the suspect with four warnings. These warnings (which have come to be known colloquially as "Miranda rights") are: a suspect "has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires."

Dickerson, 120 S. Ct. at 2331 (citing and quoting in part Miranda, 384 U.S. at 442, 479). The Supreme Court's listing of the four aforementioned Miranda rights does not include a constitutionally-compelled right to be warned that one may answer questions without an attorney being present, and then may decide to stop and consult an attorney, as the fifth paragraph of the CSP form states. Consequently, we believe that any confusion concerning the proper translation of the word "si" cannot render Bustillos-Munoz's waiver of his Miranda rights constitutionally inadequate.[7]

In sum, Bustillos-Munoz's confession is admissible and the cocaine discovered in his car need not be suppressed for lack of a proper Miranda warning or due to its being involuntary as unlawfully coerced.[8] Accordingly, the denial of the motion to suppress and

_____

[7]Moreover, the judge found that Bustillos-Munoz wrote his initials next to each of the required Miranda warnings, and that he signed and dated the CSP form.

[8]Of course, where the circumstances also raise a question about the voluntariness of a confession by a defendant made after a valid Miranda warning, there must be a determination of the voluntariness of the confession for it to comply with due process. See Dickerson, 120 S. Ct. at 2332 (citing Malloy v. Hogan, 378 U.S. 1 (1964)). A suspect

the conviction are AFFIRMED.

---

cannot be subjected to invalid coercion to obtain a confession just because he earlier was given a valid <u>Miranda</u> warning.