**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUN 17 2003**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

LUCIO ZUNIGA-PEREZ,

Defendant-Appellant.

No. 02-6141

(D.C. No. CR-01-155-C)

(W.D. Oklahoma)

---

**ORDER AND JUDGMENT** [*]

---

Before **EBEL**, **BRISCOE**, and **HARTZ**, Circuit Judges.

A jury convicted defendant Lucio Zuniga-Perez of one count of possession of marijuana with intent to distribute, in violation of 21 U.S.C. § 841(a)(1), and one count of traveling in interstate commerce in aid of a racketeering enterprise, in violation of 18 U.S.C. § 1952(a)(3). Defendant challenges his convictions, claiming that the district court erred by (1) denying his motion to suppress; (2) erroneously admitting statements of an alleged coconspirator under Federal Rule

---

[*]This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

of Evidence 801(d)(2)(E); and (3) denying his motion for judgment of acquittal. We exercise jurisdiction under 28 U.S.C. § 1291 and affirm.

## I. BACKGROUND

Defendant's convictions arose from the seizure of 2,600 pounds of marijuana from a tractor-trailer driven by Defendant and Ernesto Herrera-Medina. On the afternoon of August 1, 2001, Trooper Tracy Brown of the Oklahoma Highway Patrol pulled the tractor-trailer over for following too closely to another vehicle on Highway 54 near Guymon, Oklahoma. When he turned on his flashing lights to initiate the traffic stop, his police car's audio/video recorder engaged and recorded the entire traffic stop and subsequent events.

Inside the truck's cab were Mr. Herrera-Medina, who was driving, Defendant, who was the codriver, and Defendant's 14-year-old nephew. Trooper Brown approached the truck and asked Mr. Herrera-Medina to accompany him to the police car with the appropriate paperwork, including his driver's license and the bill of lading and log book for the truck. Mr. Herrera-Medina complied. Defendant and his nephew remained in the cab.

Once inside the police car, Trooper Brown reviewed Mr. Herrera-Medina's paperwork. The log book indicated that the truck's load had originated in Lancaster, California, and was due in Waldorf, Maryland, on August 2. It showed that Defendant and Mr. Herrera-Medina had taken a detour off the most direct

route to Maryland, and had driven the truck approximately 300 miles out of the way to Phoenix, Arizona, where they stayed for 27 hours. When Trooper Brown asked Mr. Herrera-Medina about the deviation to Phoenix, Mr. Herrera-Medina became visibly nervous. He replied that they had gone to Phoenix to visit his brother. Trooper Brown testified that he found this unusual, since it appeared that the truck's shipment would be late as a result of the side trip to Phoenix, and the driver would be financially penalized 10% for late delivery. He also testified that he found it curious that the truck was driving on Highway 54, which was a slower and less direct route towards Maryland, but which, unlike interstate highways, did not have ports-of-entry where trucks are subject to inspection.

Nevertheless, Trooper Brown decided to let Mr. Herrera-Medina go with a warning for following too closely to another vehicle. He issued the warning and returned Mr. Herrera-Medina's paperwork. Then, as Mr. Herrera-Medina began to leave the police car, Trooper Brown asked him if he would answer a few more questions. He agreed.

Trooper Brown inquired whether anyone had ever asked him or his codriver to haul anything illegal, and if there were any drugs, alcohol, or guns in the truck's trailer. Mr. Herrera-Medina answered "no" to these questions, but appeared nervous. Trooper Brown then asked Mr. Herrera-Medina whether he

would consent to a search of the truck, to which Mr. Herrera-Medina replied, "Yeah, sure."

When Mr. Herrera-Medina opened the door to the truck's trailer, Trooper Brown smelled a strong odor of raw marijuana. At that point Trooper Brown directed Mr. Herrera-Medina to go back and sit in the police car. He called for back-up and arrested Mr. Herrera-Medina, Defendant, and Defendant's nephew.

Defendant and Mr. Herrera-Medina were handcuffed and placed in custody in Trooper Brown's police car. (Defendant's nephew was put in a separate police vehicle.) As the police searched the truck, the audio/video equipment in the police car remained engaged and recorded incriminating statements in Spanish made by Defendant and Mr. Herrera-Medina. The search of the truck revealed approximately 2,600 pounds of marijuana. Subsequent to the search, Mr. Herrera-Medina told police that he had been approached by someone in Phoenix and asked to transport marijuana to New York. He claimed that Defendant knew nothing about the drugs. Defendant also told police that he was unaware that there were drugs in the trailer.

Defendant and Mr. Herrera-Medina were each indicted on one count of possession of marijuana with intent to distribute, and one count of traveling in interstate commerce in aid of a racketeering enterprise. Although Mr. Herrera-Medina pleaded guilty to the indictment, Defendant proceeded to trial. He was

convicted on both counts, and was sentenced to 120 months' imprisonment. This appeal followed.

## II. **MOTION TO SUPPRESS**

Defendant first argues that the district court erred when it denied his pretrial motion to suppress (1) the marijuana seized from the truck and (2) statements made by Defendant and Mr. Herrera-Medina in the police car. He complains about the initial stop of the truck, the subsequent detention of its passengers, and the recording of the statements. "On appeal from the denial of a motion to suppress, we review the district court's factual findings for clear error, its conclusions of law de novo, and view the evidence in the light most favorable to the prevailing party." *United States v. Gallegos*, 314 F.3d 456, 458 (10th Cir. 2002). Applying this standard, we conclude that the district court properly denied Defendant's motion to suppress.

### A. The traffic stop and detention

Defendant asserts that the initial stop of the truck and the detention of its passengers violated the Fourth Amendment. First, he contends that the traffic stop was unsupported by reasonable suspicion. But under Oklahoma law:

> No vehicle which has more than six tires in contact with the road shall approach from the rear of another vehicle which has more than six tires in contact with the road closer than three hundred (300) feet except when passing such said vehicle.

Okla. Stat. tit. 47, § 11-310(c). Trooper Brown testified at the suppression hearing that he had observed the truck following approximately 40 feet behind a vehicle with more than six tires.

Defendant counters that what Trooper Brown observed was an inadvertent "technical violation" of the statute, because "[t]he lead truck slowed down . . . causing the distance between Herrera-Medina and the lead truck to close abruptly." Aplt.'s Br. at 23. Citing *United States v. Gregory*, 79 F.3d 973 (10th Cir. 1996), he contends that such a violation is insufficient to justify the stop. We disagree.

In *Gregory* we held that a single incident of swerving to the right into the emergency lane of a winding road did not constitute a violation of a Utah statute requiring vehicles to be operated "*as nearly as practical* entirely within a single lane . . . ." *Id.* at 978 (quoting Utah Code Ann. § 41-6-61(1) (emphasis added)). *Gregory* is distinguishable from the situation here because the Oklahoma statute "provides no such leeway." *United States v. Bustillos-Munoz*, 235 F.3d 505, 513 (10th Cir. 2000) (distinguishing *Gregory* where the defendant allegedly violated a statute prohibiting the use of high-beam lights when "following another vehicle within two hundred feet to the rear, except when . . . passing").

Defendant also complains that the truck was stopped using an illegal "roving checkpoint." Aplt.'s Br. at 21. He asserts that the "mission of the

Special Operations Division of the Oklahoma Highway Patrol"—of which Trooper Brown is a member—"is to stop vehicles traveling the highways of Oklahoma, not for traffic enforcement, but to find evidence of more serious criminal activity." *Id.* These methods, according to Defendant, are unconstitutional under *City of Indianapolis v. Edmond*, 531 U.S. 32 (2000).

Defendant's reliance on *Edmond* is misplaced. In *Edmond* the Supreme Court held that it violates the Fourth Amendment for law enforcement officers to conduct a highway-checkpoint program whose primary purpose is the interdiction of illegal drugs. That case, however, dealt with *suspicionless* seizures—there, fixed checkpoints at which police, without reasonable suspicion, stopped a predetermined number of vehicles in the hopes of detecting drug-related activity. The Court inquired into the programmatic purpose behind the traffic stops because they were "undertaken pursuant to a general scheme without individualized suspicion." *Id.* at 45-46. But it reiterated the general rule that "'[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis.'" *Id.* at 45 (quoting *Whren v. United States*, 517 U.S. 806, 813 (1996)). Unlike the stops at issue in *Edmond*, the traffic stop in this case was prompted by reasonable suspicion that Mr. Herrera-Medina violated Oklahoma law. As a result, it is irrelevant whether another subjective or programmatic purpose motivated the stop. *See United States v. Botero-Ospina*, 71 F.3d 783, 787

(10th Cir. 1995) (en banc).  We hold that the initial stop did not violate the Fourth Amendment.

Defendant next argues that even if the initial stop was valid, Trooper Brown unlawfully detained the truck's passengers by continuing to question Mr. Herrera-Medina after issuing the warning citation and returning his paperwork.  He contends that Mr. Herrera-Medina's consent to search the truck was fruit of that illegal detention, and thus the marijuana seized pursuant to that consent must be suppressed.

Delay for further questioning does not violate the Fourth Amendment, however, if it is consensual.  *United States v. Patten*, 183 F.3d 1190, 1193 (10th Cir. 1999).  "A traffic stop may become a consensual encounter, requiring no reasonable suspicion, if the officer returns the license and registration and asks questions without further constraining the driver by an overbearing show of authority."  *United States v. West*, 219 F.3d 1171, 1176 (10th Cir. 2000).

After reviewing the police car's audio/video recording of the traffic stop, the district court found that Trooper Brown did not coerce or otherwise compel Mr. Herrera-Medina to remain for additional questioning after the return of the paperwork.  The record supports this finding.  Accordingly, we conclude that the district court did not clearly err in finding that Mr. Herrera-Medina voluntarily consented to the additional questioning.

B. Recording of statements in the police car

Defendant seeks to suppress the statements recorded in Trooper Brown's police car. After Trooper Brown arrested Defendant and Mr. Herrera-Medina, he placed them in his vehicle but did not advise them that it contained an audio/video device that would record their conversation. While by themselves in the police car, Defendant and Mr. Herrera-Medina made a number of incriminating statements. Defendant argues that the recording of these statements violated Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510-2522 (Title III).

Title III protects oral communications "uttered by a person exhibiting an expectation that such communication is not subject to interception under circumstances justifying such expectation . . . ." 18 U.S.C. § 2510(2). Evidence obtained in violation of Title III is inadmissible in court proceedings. 18 U.S.C. § 2515; *United States v. Turner*, 209 F.3d 1198, 1200 (10th Cir. 2000). For Title III to apply, a court must find "(1) the defendant had an actual, subjective expectation of privacy—i.e., that his communications were not subject to interception; and (2) the defendant's expectation is one society would objectively consider reasonable." *Turner*, 209 F.3d at 1200 (internal quotation marks omitted).

Our decision in *Turner* effectively forecloses Defendant's contention that Title III was violated in this case. In *Turner* the defendant and his passenger agreed to wait in a police car as an officer searched the defendant's car. While in the police car, the defendant made incriminating statements which were recorded by an audio device. We rejected the defendant's argument that the statements were obtained in violation of Title III, holding that "under Title III or the Fourth Amendment, society is not prepared to recognize an expectation that communications in a patrol car, under facts presented here, are not subject to interception." *Id.* at 1200-01 (footnote omitted).

Defendant seeks to distinguish *Turner* by arguing that, unlike the defendant in that case, Defendant and Mr. Herrera-Medina were in custody and Mirandized when their statements were recorded. But in *Turner* we stated that "whether an individual is in custody does not materially affect an expectation of privacy in a police car." *Id.* at 1201. And Defendant does not explain how the fact that Defendant and Mr. Herrera-Medina had received *Miranda* warnings changes the analysis; the recorded conversation was not the product of any interrogation. Therefore, we conclude that Defendant lacked an objectively reasonable expectation of privacy, and accordingly his statements were not obtained in violation of Title III.

We hold that the district court properly denied Defendant's motion to suppress.

## III.  **HEARSAY RULING**

Defendant next contends that the district court erred when it admitted recorded statements made by Mr. Herrera-Medina to Defendant in the police car. The court admitted the challenged statements under the coconspirator exception to the hearsay rule, Fed. R. Evid. 801(d)(2)(E), which provides that statements of a coconspirator are not considered hearsay and "may properly be admitted if the court finds: 1) a conspiracy existed; 2) both the declarant and the defendant . . . were members of the conspiracy; and 3) the statement[s] w[ere] made in the course of and in furtherance of the conspiracy." *United States v. Eads*, 191 F.3d 1206, 1210 (10th Cir. 1999) (internal quotation marks omitted).  Defendant does not argue that there was insufficient evidence from which the district court could find that Mr. Herrera-Medina's statements came within the hearsay exception. Instead, he argues that the court's finding of a conspiracy was dependent upon whether Defendant or Mr. Herrera-Medina made a particular statement on the recording, and the court improperly delegated to the jury the task of making that finding.  To understand his argument we must first discuss the events leading to the court's evidentiary ruling.

Before trial the district court held a *James* hearing to determine whether it should admit the statements from the police car. *See generally United States v. James*, 590 F.2d 575 (5th Cir. 1979). A key issue at the hearing was whether Defendant or Mr. Herrera-Medina made the statement, "I should have thrown out the Black guy's telephone [number] that's in my billfold. . . . I'm saying I've got the Black guy's telephone [number] in my billfold. This is the first time we've done this, right?" Aplt's App. at 2, 4. The government's English translation of the Spanish conversation attributed the statement to Defendant, whereas Defendant's proffered translation attributed the statement to Mr. Herrera-Medina. This is the only statement attributed to Defendant that he claims he did not make. The statement is significant because a few weeks after it was made, Trooper Brown discovered hidden between the back seats of his police car a note with a telephone number and the name "Jimmy" written on it. The telephone number was ultimately linked to a (black) marijuana dealer named Jimmy.

Defendant does not argue that someone other than Defendant or Mr. Herrera-Medina was the source of the note found in the police car. And evidence presented at the *James* hearing and at trial strongly suggested that the note was in *Defendant's* billfold when the statement was made, indicating that he, not Mr. Herrera-Medina, spoke of, "[the] telephone [number] that's in my billfold." Trooper Brown testified that when the statement was made, Defendant

-12-

was handcuffed, behind his back, in the back seat of the police car, while Mr. Herrera-Medina was handcuffed in the front seat. He stated that only an individual in the back seat would have had access to the area in the vehicle where the note was discovered. And critically, later in the recorded conversation (in a portion that was admitted on grounds other than coconspirator hearsay—a ruling that Defendant does not challenge on appeal), Mr. Herrera-Medina asked Defendant, "Can you put your hand in your pocket and take the paper out of your billfold? You can stuff it under the seat and they can find it later on," to which Defendant replied, "Let's see if I can. I got it." Aplt's App. at 11.

The court apparently believed, at least at one point, that the identity of the speaker was relevant to its determination of whether statements in the police car were admissible under Rule 801(d)(2)(E). It ultimately ruled at the conclusion of the *James* hearing that the recorded statements made before Defendant and Mr. Herrera-Medina were Mirandized—including the statement regarding the "Black guy's telephone [number]"—would be admitted under the coconspirator exception to the hearsay rule. The court stated:

> I believe that what is being said and by whom on this videotape is a question of fact for the jury and it would be inappropriate for me to invade the province of the jury. There has been an instruction submitted . . . regarding the translation and permitting the jury to find what it will about the translation. *I think whether this statement was made by [Defendant] or Mr. Herrera[-Medina] has some bearing on whether there is a conspiracy still in*

-13-

*existence and whether there is -- there are decisions being made in the course of this conversation which are in furtherance of the conspiracy.*

*If it was clear to me that that was not [Defendant] making the statement, then I think it would have been appropriate to exclude the evidence. But because it is not clear to me, it is a question of fact for the jury, and if found against [Defendant], would be in furtherance of the conspiracy.* I am going to permit the introduction of the discussion in the police cruiser up to the time of the Miranda warnings being given. Thereafter, only [Defendant's] statements may be used against him. There may be an occasion where Mr. Herrera[-Medina's] statements are not being offered for any truth therein but merely as context for [Defendant's] statements. If that is the case, they will be admitted.

R., Vol. III, at 57-58 (emphasis added).

Defendant seizes upon the emphasized portion of this language and argues that the district court admitted Mr. Herrera-Medina's statements without making the required findings under Rule 801(d)(2)(E). He asserts that the court "abdicated its role" by in effect allowing the jury to determine whether the coconspirator exception applied. Aplt.'s Br. at 29. But he ignores the later portion of the *James* hearing when the court's thinking had apparently crystalized and the court unequivocally stated the Rule 801(d)(2)(E) predicates were satisfied:

Before the Miranda warnings, my ruling is: *The statements made by both [Defendant] and Mr. Herrera[-Medina] are in furtherance of the conspiracy that I find to exist from not only this conversation but all other testimony at the motion to suppress and*

-14-

*that I heard this morning, and those conversations are therefore admissible.* They will be admissible subject to an instruction to the jury that they are free to find whatever they find about the translation.

R., Vol. III, at 59 (emphasis added).

Although the district court stated that its ruling was "subject to" a jury instruction, the court did not instruct the jury regarding a conspiracy or any of the other Rule 801(d)(2)(E) predicates. Rather, the court's reference to a jury instruction is consistent with the instructions it ultimately gave—that the jury was not bound by either side's translation of the recorded conversation, and that it, as the factfinder, must decide what was said on the tape and by whom.

Our conclusion that the district court made the required Rule 801(d)(2)(E) findings is buttressed by later statements by the court. At trial the court said:

> My ruling is that at the time the Miranda warnings were given, the conspiracy is over. Any statement made thereafter is neither in the course of or in furtherance of the conspiracy. Nothing comes in under the co-conspirator exception after the warning. However, [Defendant's] statements can come in whenever they were made as his own statements.

R., Supp. Vol. I, at 123.

To the extent that Defendant is arguing that the identity of the declarant is itself an additional Rule 801(d)(2)(E) predicate, his argument misses the mark. The identity of the declarant need not be established so long as the district court

determines that the declarant was a member of a conspiracy with the defendant and that the statement was made in the course of and in furtherance of the conspiracy. *See, e.g.,* 4 Christopher B. Mueller & Laird C. Kirkpatrick, *Federal Evidence*, § 426, at 299 (2d ed. 1994) ("[I]f it is clear that the statement was made by someone in a conspiracy with the defendant, inability to attribute the statement to a particular person does not prevent resort to the [coconspirator] exception."). As we have discussed, the district court made those findings, and Defendant does not argue that they were incorrect. Our conclusion also disposes of Defendant's argument that the admission of the statements violated his Confrontation Clause rights under *Bruton v. United States*, 391 U.S. 123 (1968). *See Bourjaily v. United States*, 483 U.S. 171, 182 (1987) ("[T]he requirements for admission under Rule 801(d)(2)(E) are identical to the requirements of the Confrontation Clause, and since the statements were admissible under the Rule, there was no constitutional problem.").

We note that the district court ruled that Defendant's own statements from the police car were admissible as party admissions. *See* Fed. R. Evid. 801(d)(2)(A). Defendant does not challenge this ruling. Thus, if Defendant made the statement regarding the "Black guy's telephone [number]"—the only statement within the ambit of the district court's coconspirator hearsay ruling that Defendant identifies as being prejudicial—the statement would be admissible

against him if he was the speaker.  As discussed above, there was ample evidence from which the jury could infer that Defendant made the statement.  Under the circumstances, the identity of the speaker was a proper jury question, *see* Fed. R. Evid. 104(b); *United States v. Gil*, 58 F.3d 1414, 1419-20 (9th Cir. 1995) (district court properly admitted written statement as party admission subject to jury's determination that defendant was the author, where there was sufficient evidence from which jury could infer that defendant made the statement), and the district court did not err in admitting the statement.

## IV.  MOTION FOR JUDGMENT OF ACQUITTAL

Defendant's final argument is that the district court erred in denying his motion for judgment of acquittal, because there was insufficient evidence to support his convictions for either (1) possession of marijuana with intent to distribute, or (2) traveling in interstate commerce in aid of a racketeering enterprise.  Defendant argues that the government failed to show a link between himself and the marijuana found in the truck, and therefore failed to carry its burden of proving knowing possession of the drugs.  We review "a denial of a motion for judgment of acquittal *de novo*, viewing the evidence in the light most favorable to the government in determining if there is substantial evidence from which a jury could find the defendant guilty beyond a reasonable doubt." *United States v. Austin*, 231 F.3d 1278, 1283 (10th Cir. 2000).

-17-

Possession of a controlled substance may be actual or constructive. *See United States v. Reece*, 86 F.3d 994, 996 (10th Cir. 1996). "[C]onstructive possession may be found if a person knowingly has ownership, dominion or control over the narcotics and the premises where the narcotics are found." *Id.* (internal quotation marks omitted). "To prove constructive possession when there is joint occupancy of a vehicle, the government must present direct or circumstantial evidence to show some connection or nexus individually linking the defendant to the contraband." *United States v. Valadez-Gallegos*, 162 F.3d 1256, 1262 (10th Cir. 1998). "The government must present some evidence supporting at least a plausible inference that the defendant had knowledge of and access to the . . . contraband." *Id.* (internal quotation marks omitted; ellipsis in the original).

Viewed in the light most favorable to the government, the evidence was sufficient for a rational jury to conclude that Defendant had constructive possession of the marijuana seized from the truck. His involvement with the drugs extended beyond his mere presence in the truck, or even his role as codriver. Most important is the evidence that when Defendant was arrested, he had in his billfold a note containing the name and telephone number of the person whom Defendant admits was "the individual to whom the marijuana was to be delivered." Aplt's Br. at 33. Also quite damaging were his statements to

-18-

Mr. Herrera-Medina as the police were searching the truck: "I'm gonna tell them I don't know anything," Aplt's App. at 2, 4; "The first time, man, that they catch us," *id.* at 18; and "The trouble I got this one into," a reference to his nephew, who had been traveling with them. *Id.* at 2, 4. One can also infer guilty knowledge from evidence that he resorted to false statements to explain the truck's detour to Phoenix. *See United States v. Johnson*, 57 F.3d 968, 972 (10th Cir. 1995).

With respect to the requirement that the government prove that Defendant possessed the marijuana with the specific intent to distribute it, we note that "[a] large quantity of the drug will support a reasonable inference that a defendant intended to distribute it." *United States v. Wood*, 57 F.3d 913, 918 (10th Cir. 1995). Approximately 2,600 pounds of marijuana was seized from the truck; the government valued it at over $4 million. A drug enforcement agent testified that this was not an amount for personal use. On these facts, the jury could infer intent to distribute. We conclude that there was sufficient evidence admitted at trial from which a rational jury could find that Defendant knowingly possessed the marijuana with the intent to distribute.

Sufficient evidence also supports Defendant's conviction for traveling in interstate commerce in aid of a racketeering enterprise, 18 U.S.C. § 1952(a)(3) (Travel Act). To establish a Travel Act violation, the government was required to

prove that Defendant: "(1) traveled or used facilities in interstate commerce; (2) with the intent to promote, manage, establish, carry on or facilitate the promotion, management, establishment, or carrying on of a prohibited activity; and (3) thereafter attempted to or did in fact engage in one of the proscribed activities." *United States v. Dorrough*, 927 F.2d 498, 502 (10th Cir. 1991). A proscribed or unlawful activity is defined as, among other things, a "business enterprise involving . . . narcotics or controlled substances . . . ." 18 U.S.C. § 1952(b)(1).

Defendant's argument with respect to the Travel Act conviction is identical to his argument regarding his conviction for possession with intent to distribute—that there was insufficient evidence linking him to the drugs. For the reasons already stated, we disagree. Accordingly, after reviewing the trial record, we are satisfied that a rational jury could properly convict Defendant under the Travel Act.

## V. CONCLUSION

We **AFFIRM** the judgment of the district court.

ENTERED FOR THE COURT


Harris L Hartz
Circuit Judge


-20-